IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NGOZI IWEHA,

        **Plaintiff,**

v.

STATE OF KANSAS,
KANSAS DEPARTMENT OF AGING
AND DISABILITY SERVICES,
MARY SEDDON, LESIA DIPMAN,
and JOHN FOX,

        **Defendants.**

Case No. 21-1228-DDC-RES

## MEMORANDUM AND ORDER

For three years, plaintiff Ngozi Iweha worked as a pharmacist in the Larned State Hospital facility operated by two of the defendants—the State of Kansas and the Kansas Department of Aging and Disability Services (KDADS). Plaintiff alleges that in the last year or so of her employment, her supervisor and one co-worker (also defendants), treated her differently based on her race and national origin, resulting in termination of her employment. Plaintiff now brings this lawsuit, alleging four claims of discrimination and retaliation under Title VII and 42 U.S.C. §§ 1981, 1983. Defendants move under Fed. R. Civ. P. 12(b)(6) to dismiss two of plaintiff's claims: (1) her Title VII hostile work environment claim against the two state defendants, and (2) her § 1981 claims against the three individual defendants—Ms. Mary Seddon,[1] Mr. John Fox, and Ms. Lesia Dipman. *See* Doc. 10. The court denies defendants' motion in part and grants it in part. Plaintiff has alleged a plausible Title VII hostile

---

[1] The Complaint and almost all briefing on the Motion to Dismiss identify this defendant as Ms. Mary Sedden. But, in their Reply, defendants spell her surname as Seddon. The court refers to her as Ms. Seddon because that's how her counsel spells her name in the latest filing.

work environment claim against the state defendants and a § 1981 claim against Ms. Seddon. But the court dismisses the § 1981 claims against Ms. Dipman and Mr. Fox. The court explains this ruling, below.

## I.     Background

The court must accept plaintiff's "well-pleaded facts as true, view[s] them in the light most favorable to [her], and draw[s] all reasonable inferences from the facts" in her favor. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).

Plaintiff "is a naturalized United States citizen, who lived the first twenty-four years of her life in Nigeria." Doc. 1 at 2 (Compl. ¶ 5). She "is 50 years old, is black and an African American." *Id.* She also "speaks with a slight accent." *Id.* at 8 (Compl. ¶ 38). Plaintiff is a fully licensed pharmacist in Kansas. *Id.* at 3 (Compl. ¶ 9). From 2017 to 2020, she worked as a pharmacist in the Larned State Hospital operated by defendants, the State of Kansas and KDADS. *Id.* She worked as one of four pharmacists in the facility, filling prescriptions during pharmacy hours. *Id.* Her other job responsibilities included "acting as quality assurance to double check prescriptions filled by other pharmacists." *Id.* (Compl. ¶ 11).

During the first year of her employment or so, plaintiff worked for Ms. Lola Olagunju, the pharmacy's manager and plaintiff's direct supervisor. *Id.* at 3, 4 (Compl. ¶¶ 10, 15). Like plaintiff, Ms. Olagunju was of Nigerian descent. *Id.* at 3 (Compl. ¶ 10). Plaintiff worked with three other pharmacists: Ms. Mary Seddon and Mr. John Fox (who are both defendants) and Ms. Janet Finger (who's not). *Id.* at 2–4 (Compl. ¶¶ 6, 8, 15–16). Plaintiff alleges that both Mr. Fox and Ms. Finger are white and were born in America. *See id.* at 6, 8–9 (Compl. ¶¶ 24, 39). Plaintiff doesn't specify Ms. Seddon's race or national origin.

In 2018, Ms. Olagunju left her employment with Larned State Hospital. *Id.* at 4 (Compl. ¶ 15). Ms. Seddon was promoted to take her place as the pharmacy's manager. *Id.* Ms. Seddon thus became plaintiff's direct supervisor. In 2019, Ms. Seddon, Mr. Fox, and Ms. Finger began "flexing" their schedules, meaning that they arrived to work at 6:30 a.m. or 7:00 a.m. before the pharmacy opened at 8:00 a.m. *Id.* (Compl. ¶ 16). They also left early before the pharmacy closed at 4:30 p.m. *Id.* (Compl. ¶¶ 13, 16). Plaintiff "initially did not participate in the new flex schedules of the other pharmacists." *Id.* (Compl. ¶ 17).

Starting in 2020, KDADS evaluated pharmacists based on how many prescriptions they filled—what plaintiff calls a "script count." *Id.* (Compl. ¶ 14) (internal quotations omitted). As a result, plaintiff alleges, pharmacists who arrived early "could get a head start on their script count by filling all of the prescriptions that were called in the night before." *Id.* Given this new incentive, plaintiff "requested that she be included in a flex schedule and that the four pharmacists rotate" the early morning start. *Id.* (Compl. ¶ 17). But Ms. Seddon denied plaintiff's request "with no reason given." *Id.* Plaintiff then asked Ms. Seddon to "level the playing field" and allow plaintiff "to fill the overnight prescriptions to keep the count equal and fair among the pharmacists." *Id.* at 5 (Compl. ¶ 18). Ms. Seddon denied that request as well because, in her view, "the system was fair[.]" *Id.* But, Ms. Seddon allegedly told plaintiff, the other pharmacists would leave a quarter of the overnight prescriptions for her to fill. *Id.* This equitable arrangement never materialized. *Id.*

Around the same time as the scheduling changes, plaintiff alleges that the other pharmacists—including her supervisor, Ms. Seddon—began harassing her and discriminating against her. Plaintiff alleges that her co-workers asked "intentionally inappropriate questions about [her] native country of Nigeria." *Id.* (Compl. ¶ 19). Specifically, Mr. Fox once asked

3

plaintiff how people traded in Nigeria and plaintiff showed him photographs of Nigerian currency on the internet. *Id.* Plaintiff alleges that "Mr. Fox responded by bringing slave trade beads to the workplace, making reference to the slave trade." *Id.* Plaintiff "was deeply offended by discussion of the slave trade" while "attempting to discuss modern day currency." *Id.* Because of Mr. Fox's conduct, among other things, plaintiff reported to Ms. Seddon "several times that she was very upset by the racially hostile work conditions." *Id.* (Compl. ¶ 20). But Ms. Seddon was indifferent to her concerns. *Id.* Indeed, plaintiff alleges that Ms. Seddon herself repeatedly made derogatory comments, like "women from Nigeria are not educated and the ones that are, they are bossy." *Id.* (internal quotations omitted).

By summer 2020, plaintiff alleges that Mr. Fox and Ms. Finger treated her "with open hostility[.]" *Id.* at 6 (Compl. ¶ 21). Plaintiff's job required her to cross check how certain medications interacted before filling a prescription. *See id.* at 4, 6 (Compl. ¶¶ 12, 22). But, when performing this duty, Mr. Fox would berate plaintiff and complain about her to Ms. Seddon for "holding up the queue[.]" *Id.* at 6 (Compl. ¶ 22) (internal quotations omitted). Plaintiff alleges that Mr. Fox didn't make similar comments to her white and American-born co-workers. *Id.* So, plaintiff "sent a very specific email pleading with Ms. Sedd[o]n for fair treatment" because "she only wanted to be part of the team." *Id.* (Compl. ¶ 23). Ms. Seddon didn't respond. *Id.*

Then, one day in June 2020, Ms. Seddon was out of the office on annual leave. *Id.* (Compl. ¶ 24). Mr. Fox and Ms. Finger left work early, leaving plaintiff to run the pharmacy by herself. *Id.* When plaintiff asked who would serve as her backup, if needed, Mr. Fox and Ms. Finger responded that Ms. Seddon gave them permission to leave early. *Id.* After Mr. Fox and Ms. Finger left, an emergency prescription came in. *Id.* (Compl. ¶ 25). Because plaintiff was

4

working alone, she filled the prescription without having another pharmacist double check the prescription, as required.  *Id.*  So, plaintiff emailed and texted Ms. Seddon, asking what she should do.  Ms. Seddon didn't respond.  *Id.*

The next day, Mr. Fox and Ms. Finger left work early again, leaving plaintiff to run the pharmacy by herself.  *Id.* at 7 (Compl. ¶ 26).  The day after that, Ms. Seddon (who was still out of the office) called Mr. Fox and Ms. Finger.  *Id.* (Compl. ¶ 27).  Plaintiff alleges she overheard Mr. Fox complaining to Ms. Seddon that plaintiff was "holding up the prescription queue[.]"  *Id.*  Plaintiff disagreed with Mr. Fox's complaint, prompting him to begin "screaming and confronting" her with comments like, "If you want a war, I'll give you a war."  *Id.* (Compl. ¶¶ 27–28).  These comments made plaintiff emotional, so she went to the bathroom for a moment.  *Id.* (Compl. ¶ 28).  When she returned to her workstation, a KDADS Human Resources representative called her and told her KDADS was putting her on leave because HR "needed to conduct an investigation."  *Id.* (Compl. ¶ 29).

Plaintiff was on leave for about a month and a half.  During that time, plaintiff alleges that no one from HR ever called her for an interview.  *Id.* (Compl. ¶ 30).  Eventually, at the end of July 2020, a KDADS representative called plaintiff and read her a letter terminating her employment.  *Id.* (Compl. ¶ 31).  Plaintiff objected to the termination.  *Id.* at 8 (Compl. ¶ 32).  But in early August 2020, KDADS formally terminated plaintiff's employment.  *Id.*

Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) and the Kansas Human Rights Commission on August 7, 2020.  *Id.* (Compl. ¶ 34).  The EEOC sent plaintiff a right to sue letter on June 24, 2021.  *Id.* (Compl. ¶ 35).  Plaintiff timely filed this lawsuit on September 20, 2021.  *See id.*

5

## II. Legal Standard

Fed. R. Civ. P. 12(b)(6) allows a party to move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, the Supreme Court has explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III. Analysis

Of plaintiff's four claims, defendants seek to dismiss two: her Title VII hostile work environment claim against the state defendants and her § 1981 claims against the individual defendants. The court addresses each claim, in turn, below.

### A.     Title VII Hostile Work Environment

*First*, defendants argue that plaintiff has failed to allege plausible hostile work environment under Title VII because she hasn't alleged that she was subjected to severe or pervasive conduct because of her race or national origin.

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). The statute's reference to "terms, conditions, or privileges of employment" isn't limited to economic or tangible discrimination—it also includes a prohibition against requiring employees "to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (internal quotations omitted)). An employer thus violates Title VII when it maintains a workplace "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Meritor*, 477 U.S. at 65, 67).

To state a plausible Title VII claim based on racial or national origin harassment, plaintiff must allege facts capable of supporting a plausible finding or inference "that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (quotation cleaned up); *see also Unal v. Los Alamos Pub. Schs.*, 638 F. App'x 729, 735–36 (10th Cir. 2016) (reciting similar prima facie standard for "harassment . . . based on national origin" (quotation cleaned up)). Here, defendants challenge merely the first element of plaintiff's hostile work

7

environment claim. They argue that plaintiff fails to allege facts supporting a plausible inference that the conduct she alleges was sufficiently pervasive.

The Tenth Circuit has explained that "pervasiveness and severity are independent and equal grounds upon which a plaintiff may establish this element of a hostile environment claim." *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (quotation cleaned up). But, pervasiveness and severity "'are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.'" *Id.* (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)).

Determining whether the workplace is an objectively hostile work environment is not "a mathematically precise test." *Harris*, 510 U.S. at 22. This means the court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. But, when judging hostility, the court must ensure that it does not turn Title VII into a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted). Conduct "that is merely offensive" doesn't violate Title VII. *Harris*, 510 U.S. at 21. Instead, Title VII only prohibits conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive[.]" *Id.*

Here, plaintiff alleges the following incidents to support her hostile work environment claim:

- her co-workers' "inappropriate questions about [her] native country of Nigeria[,]" including Mr. Fox's question about how people traded in Nigeria and his bringing "slave

8

  trade beads to the workplace, making reference to the slave trade[,]" Doc. 1 at 5 (Compl. ¶ 19);

- Ms. Seddon's repeated derogatory comments about Nigerian women, like "women from Nigeria are not educated and the ones that are, they are bossy[,]" *id.* (Compl. ¶ 20) (internal quotations omitted);

- Ms. Seddon denying plaintiff's requests for a flex schedule and to distribute overnight prescriptions equitably among plaintiff and her white and American-born co-workers, *id.* at 4–5 (Compl. ¶¶ 17–18);

- Ms. Seddon's indifference to plaintiff's complaints of unequal treatment and racially hostile work conditions, *id.* at 5, 6 (Compl. ¶¶ 20, 23);

- the two incidents in June 2020 when Mr. Fox and Ms. Finger ended work early (allegedly with Ms. Seddon's permission), leaving plaintiff to fill prescriptions by herself, violating pharmacy requirements, *id.* at 6–7 (Compl. ¶¶ 24–26);

- Mr. Fox's frequent complaints that plaintiff was "holding up the prescription queue" when she was performing required cross-checks, *id.* at 7 (Compl. ¶ 27); and

- KDADS suspending plaintiff and eventually terminating her employment after Mr. Fox complained to Ms. Seddon and screamed at plaintiff that if she wanted a war, he'd give her a war, *id.* (Compl. ¶¶ 27–31).

Viewing plaintiff's allegations in their totality—as the court must—she alleges conduct that can support a plausible finding or inference of pervasive harassment based on race or national origin. She has alleged more than an isolated incident of harassment. And when combined with the steadily intensifying differential treatment leading to her suspension and termination, plaintiff's allegations cross the line from possible to plausible, thus sufficing to survive dismissal. *See Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) (explaining that, when evaluating a complaint against a dismissal motion, the "question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law"); *see also Dawson v. Home Depot*, No. 20-4085-KHV, 2021 WL 3784377, at *5 (D. Kan. Aug. 26, 2021) ("In the context of stating a

plausible claim for relief, plaintiff must put defendant on notice of [her] claims, not plead all of [her] evidence.").

Defendants train their fire on the small number of comments plaintiff alleges. Defendants contend that this case mirrors other cases where our court and our Circuit have held that alleging just a few overtly racial comments won't suffice to raise a plausible hostile work environment claim. *See, e.g.*, *Shelby v. Mercy Reg'l Health Ctr.*, No. 07-4147-EFM, 2009 WL 1067309, at *3 (D. Kan. Apr. 21, 2009) (dismissing hostile work environment claim because the court was "unable to conclude that one remark directed at Plaintiff, which [had] conflicting meanings and [could] be interpreted in a variety of ways, [was] indicative of unequal terms and conditions of employment or harassment under Title VII"); *Bryant v. Neb. Furniture Mart*, No. 20-2216-DDC-JPO, 2021 WL 259294, at *8–9 (D. Kan. Jan. 26, 2021) (dismissing hostile work environment claim because "plaintiff allege[d] no overtly racial comment or remark that might constitute severe or pervasive harassment"); *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 522–23 (10th Cir. 2017) (affirming dismissal of hostile work environment claim based on three "inappropriate and offensive" racial comments because such verbal harassment, even when combined with co-workers giving plaintiff "the cold shoulder" after he complained, wasn't so "severe or pervasive that a reasonable person would find it altered the conditions of [plaintiff's] employment and created an abusive working environment").

But this case is different. Plaintiff's claim doesn't rely merely on two overtly racial comments about her national origin. It also relies on steadily intensifying differential treatment by her supervisor and her white and American-born co-workers. And our Circuit's precedent "unmistakably requires" the court to consider overtly racial and facially neutral conduct together. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1224 (10th Cir. 2015) ("We have long held that facially

10

neutral abusive conduct can support a finding of racial animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly racially-discriminatory conduct." (quotation cleaned up)).

Viewing all of plaintiff's allegations in their totality and drawing all inferences in her favor, this case is more like the cases plaintiff cites—where our court has concluded that plaintiffs alleged a plausible hostile work environment claim. *See, e.g.*, *Clay v. United Parcel Serv., Inc.*, 983 F. Supp. 2d 1331, 1342 (D. Kan. 2013) (finding plaintiff alleged plausible hostile work environment claim where plaintiff overheard racial slurs on radio, defendant ignored plaintiff's complaint about co-worker's confederate flag license plate, and co-worker told plaintiff a joke with racially offensive terms); *Shoemake v. McCormick, Summers & Talarico II, LLC*, No. 10-2514-RDR, 2011 WL 4915742, at *3 (D. Kan. Oct. 17, 2011) (finding plaintiff plausibly alleged hostile work environment claim because even though there were "not a lot of facts alleged in the complaint" plaintiff did "allege contrived disciplinary action, illegal surveillance, offensive and discriminatory comments, and a hostile environment which lasted for a year and a half"); *Zhu v. Fed. Hous. Fin. Bd.*, 389 F. Supp. 2d 1253, 1287 (D. Kan. 2005) (finding plaintiff plausibly alleged hostile work environment based on her national origin even though she alleged "only two derogatory references to her national origin"); *cf. Sheets v. Sonic Indus., LLC*, No. CIV-20-01056-PRW, 2021 WL 3074188, at *2 (W.D. Okla. July 20, 2021) (recognizing that "[i]ndividually, a few stray remarks in bad taste" and other conduct "may not be sufficient to allege an objectively intolerable work environment that would compel the proverbial reasonable employee to quit[,]" but "in conjunction, and with the benefit of liberal inference afforded to plaintiffs at this early stage [on a motion to dismiss,]" plaintiff's

"allegations eke the accusation of constructive discharge across the line of plausibility"). Plaintiff's Title VII hostile work environment claim thus survives dismissal.

### B. § 1981 Claims

Next, the court turns to plaintiff's § 1981 race discrimination claims against the three individual defendants: Ms. Seddon, Mr. Fox, and Ms. Dipman.[2] Each defendant moves to dismiss the claim against them, arguing that plaintiff's allegations can't support a plausible inference or finding of personal involvement in discrimination sufficient to trigger liability under § 1981. Also, as state employees, defendants each assert qualified immunity. The court addresses their arguments, below. But first, the court recites the governing law for § 1981 claims and qualified immunity.

"Section 1981 prohibits racial discrimination in 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Reynolds v. Sch. Dist. No. 1, Denver*, 69 F.3d 1523, 1532 (10th Cir. 1995) (quoting 42 U.S.C. § 1981(a)–(b)) (footnote omitted). To "establish a prima facie case of discrimination under § 1981, the plaintiff must show: (1) that the plaintiff is a member of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101–02 (10th Cir. 2001) (footnote omitted).[3]

---

[2] Plaintiff's § 1981 claims arise under § 1983 because "damages claims against state actors for § 1981 violations must be brought under § 1983." *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006); *see also Crews v. Paine*, 686 F. App'x 540, 542 n.2 (10th Cir. 2017) (continuing to recognize that § 1983 is "the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor" (quotation cleaned up)). While plaintiff labels her claims as § 1981 claims, her Complaint adequately pleads federal subject matter jurisdiction under § 1983. *See* Doc. 1 at 1 (Compl. ¶ 1).

[3] The Complaint asserts both race and national origin discrimination under § 1981. *See* Doc. 1 at 12 (Count IV Heading). But, our Circuit recognized many years ago that "§ 1981 does not outlaw

To seek personal liability against an individual state actor under § 1981, a plaintiff must allege the actor's personal involvement. Specifically, a plaintiff must allege "some affirmative link to causally connect the actor with the discriminatory action." *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991), *overruled on other grounds by Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir. 2000). A plaintiff can show personal involvement "through allegations of personal direction or of actual knowledge and acquiescence." *Figures v. Bd. of Pub. Utils.*, 731 F. Supp. 1479, 1483 (D. Kan. 1990). But, the Supreme Court recently has clarified the causation standard that applies to § 1981 claims. "To prevail" on a § 1981 claim, "a plaintiff must initially plead and ultimately prove that, *but for race*, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (emphasis added).

Also, when a defendant asserts qualified immunity—as all three individual defendants do here—plaintiff must satisfy a two-prong showing: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). That's because the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).

---

national origin discrimination per se, only discrimination on the basis of race." *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 n.7 (10th Cir. 1991). Nevertheless, the "concept of race under § 1981 is broad" and "extends to matters of ancestry which are normally associated with nationality, not race in a biological sense." *Id.* Thus, for plaintiff's § 1981 claims, the court considers her allegations of race and national origin discrimination in their totality.

### 1. Defendant Dipman

The Complaint fails to allege facts against Ms. Dipman capable of supporting a finding or inference of personal liability under § 1981. Indeed, the Complaint's factual allegations don't mention Ms. Dipman at all until paragraph 63 (almost at the end of the Complaint, under the heading for Count IV, the § 1981 claim). There, in that paragraph, plaintiff alleges that Ms. Dipman is the person who suspended and ultimately terminated her employment "based on the KDADS 'investigation[.]'" Doc. 1 at 12 (Compl. ¶ 63). And, plaintiff alleges—albeit in conclusory fashion—that Ms. Dipman was motivated by racial animus. *Id.* (Compl. ¶ 65). But these thin allegations don't suffice to state a § 1981 claim. The Complaint doesn't allege that Ms. Dipman was involved at all with this case's main event: the alleged differential treatment and hostile work environment in the Larned State Hospital pharmacy.

Instead, plaintiff's theory against Ms. Dipman centers on her alleged failure to conduct an independent investigation before terminating plaintiff's employment. *Id.* (Compl. ¶ 63) (alleging that Ms. Dipman terminated plaintiff's employment "without even interviewing [her] or giving her an opportunity to respond to allegations made against her with no evidentiary basis"). But this theory suffers two determinative flaws.

*First*, it concedes implicitly that race was not the but for cause of Ms. Dipman's decision to terminate plaintiff's employment. *See Comcast Corp.*, 140 S. Ct. at 1019 ("To prevail, a [§ 1981] plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."). Indeed, the Complaint itself alleges that Ms. Dipman based her decision to terminate plaintiff's employment "on the KDADS 'investigation[.]'" Doc. 1 at 12 (Compl. ¶ 63). The Complaint doesn't allege any facts capable of supporting an inference or finding that Ms. Dipman acted with any racial animus when she

14

made this decision.  And even if racial animus somehow tainted the investigation—something plaintiff never alleges—our Circuit has suggested there isn't "any authority holding an unbiased decisionmaker *personally* liable under § 1983 for an adverse action allegedly traceable to another's improper animus."  *Crews v. Paine*, 686 F. App'x 540, 546 (10th Cir. 2017).  And for good reason.  As the Circuit put it, "such a holding would appear contrary to basic limits on personal liability under § 1983, which, eschewing principles of respondeat superior, make 'each Government official . . . only liable for his or her own misconduct.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 677).

*Second*, it's not at all clear that failing to conduct an independent investigation can support personal liability under § 1981.  Plaintiff cites no authority where a decisionmaker faced § 1981 liability in such a circumstance.  But Ms. Dipman cites a case from the District of Colorado where that court concluded, after reviewing relevant Tenth Circuit authority, that there was no clearly established requirement that decisionmakers investigate alleged misconduct independently before terminating a plaintiff's employment.  *See Crews v. City & Cnty. of Denver Sch. Dist. No. 1*, No. 13-cv-02912-MSK-MEH, 2017 WL 11549919, at *7–8 (D. Colo. Sept. 12, 2017).  The court finds *Crews* persuasive.  Even if plaintiff plausibly had alleged a § 1981 violation against Ms. Dipman, such a violation isn't clearly established in our Circuit.  Plaintiff thus fails to overcome Ms. Dipman's assertion of qualified immunity.

In sum, plaintiff fails to state a § 1981 claim against Ms. Dipman for two independent reasons:  (1) the Complaint fails to allege any facts capable of supporting a finding or inference of personal liability; and (2) Ms. Dipman is entitled to qualified immunity.

## 2. Defendant Fox

Next, plaintiff argues that she's stated a § 1981 claim against Mr. Fox because she's sufficiently alleged Mr. Fox's personal involvement in racial discrimination. Specifically, she argues, his conduct created a hostile work environment and his complaints about her work performance triggered the eventual termination of her employment. But plaintiff's § 1981 claim against Mr. Fox fails for reasons wholly apart from his alleged conduct.

While neither our Circuit nor our court has addressed the question directly, defendants highlight that the weight of authority outside our Circuit holds that plaintiffs can't bring § 1981 claims against non-supervisory co-workers. *See, e.g.*, *Tnaib v. Document Techs., LLC*, 450 F. Supp. 2d 87, 92 (D.D.C. 2006) ("Section 1981 does not create a grounds for a cognizable claim against a co-worker."); *Mbadiwe v. Union Mem'l Reg'l Med. Ctr., Inc.*, No. 3:05CV49-MU, 2005 WL 3186949, at *2 (W.D.N.C. Nov. 28, 2005) (finding allegation that defendant was "a co-worker who provided information to a decision-making body" was "insufficient to state a claim against her under section 1981"). Indeed, the few courts who have considered this question all note that plaintiffs can bring § 1981 claims against individual defendants "only where those individuals exercised supervisory authority over the plaintiff." *Williams v. Morgan Stanley & Co., Inc.*, No. 08-12435, 2009 WL 799162, at *9 (E.D. Mich. Mar. 24, 2009); *see also Miller v. Wachovia Bank, N.A.*, 541 F. Supp. 2d 858, 861–65 (N.D. Tex. 2008) (concluding, after extensively reviewing relevant case law, that "§ 1981's focus on the right to contract and the contractual relationship limits § 1981 non-employer liability to 'those who have authority to act on behalf of the employer in making and enforcing the employer's contracts'" (quoting *Hicks v. IBM*, 44 F. Supp. 2d 593, 597 (S.D.N.Y. 1999))). Crucially, plaintiff doesn't allege that Mr. Fox exercised any supervisory authority over her.

To be sure, our Circuit doesn't categorically foreclose § 1981 claims against non-supervisory co-workers. But without an applicable Tenth Circuit or Supreme Court case providing that non-supervisory co-workers can face § 1981 liability—and given the weight of authority cited here reaching the opposite conclusion—the court must conclude that it's not clearly established plaintiff can bring a § 1981 claim against Mr. Fox, her non-supervisory co-worker. *See Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (explaining that the law is clearly established where there's either "an on-point Supreme Court or published Tenth Circuit decision that establishes the unlawfulness of the defendant's conduct" or "the clearly established weight of authority from other courts . . . found the law to be as the plaintiff maintains" (quotation cleaned up)). Thus, Mr. Fox is entitled to qualified immunity.

### 3. Defendant Seddon

The story's different for Ms. Seddon. She was plaintiff's supervisor. And so, she exercised the necessary authority to face potential § 1981 liability.

As described above, plaintiff alleges that her workplace conditions changed once Ms. Seddon became the pharmacy's manager. Accepting plaintiff's allegations as true (as the court must), Ms. Seddon denied plaintiff's request to participate in "flex" scheduling along with her white and American-born co-workers, for "no reason[.]" Doc. 1 at 4 (Compl. ¶ 17). Ms. Seddon also denied plaintiff's request to distribute overnight prescriptions equitably amongst the staff. *Id.* at 5 (Compl. ¶ 18). These two decisions allegedly caused plaintiff to fall behind her white and American-born co-workers in the prescription count, which is how KDADS evaluated pharmacists' job performance. *See id.* at 4 (Compl. ¶ 14). And, when plaintiff repeatedly complained of a racially hostile work environment, Ms. Seddon didn't respond or responded with indifference. *Id.* at 5, 6 (Compl. ¶¶ 20, 23). Indeed, plaintiff alleges that Ms. Seddon

17

herself made multiple derogatory comments about Nigerian women, like "women from Nigeria are not educated and the ones that are, they are bossy." *Id.* at 5 (Compl. ¶ 20) (internal quotations omitted). Finally, Ms. Seddon didn't respond to plaintiff's questions about filling an emergency prescription after her co-workers left work early (allegedly with Ms. Seddon's permission)—forcing plaintiff to violate pharmacy rules and fill the emergency prescriptions by herself. *Id.* at 6–7 (Compl. ¶¶ 24–29). KDADS suspended plaintiff the next day. *Id.* at 7 (Compl. ¶ 29).

It's no stretch to conclude that these allegations against Ms. Seddon, when viewed together and drawing all inferences in plaintiff's favor, are capable of supporting a finding or inference that Ms. Seddon violated plaintiff's § 1981 rights. *See Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (explaining that the "requisite causal connection" for § 1983 claims "is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights" (quotation cleaned up)); *Fulcher v. City of Wichita*, 445 F. Supp. 2d 1271, 1281 (D. Kan. 2006) (finding § 1981 plaintiffs "affirmatively link[ed]" defendant's actions to a discriminatory act where they alleged that defendant had "consistently ignored complaints about discriminatory working conditions, inadequately addressed minority complaints, and failed to implement steps to eliminate these unlawful working conditions" (quotation cleaned up)); *Garner v. N.E.W. Indus., Inc.*, No. 13-C-0569, 2013 WL 6806186, at *2 (E.D. Wis. Dec. 19, 2013) (collecting cases where plaintiffs alleged that they told supervisor about harassment, supervisor didn't take any action to prevent hostile work environment, and court held that allegation "sufficient to allege personal involvement under section 1981"). Also, in one of the cases cited above where the court held plaintiff couldn't bring a § 1981 claim against a co-worker, the court found that

18

plaintiff alleged a plausible § 1981 claim against her supervisors because they "were aware of the alleged hostile work environment and failed to take adequate steps to remedy the situation." *Hicks*, 44 F. Supp. 2d at 599 (denying supervisory defendants' motion to dismiss).

The court also concludes that Ms. Seddon's alleged conduct, if proved, violates clearly established law. *See Fulcher*, 445 F. Supp. 2d at 1281 (declining to dismiss plaintiff's § 1981 claim on qualified immunity grounds because defendant's "inaction in the face of actual knowledge of discriminatory conduct, if proven, violates plaintiffs' constitutional rights to equal protection" (first citing *Fye v. Okla. Corp. Comm'n*, 175 F. App'x. 207, 211 (10th Cir. 2006) (denying qualified immunity because defendant's "complete inaction in the face of actual knowledge" of sexual harassment, if proven, violated plaintiff's equal protection rights which were, "at the time, clearly established"); then citing *Johnson v. Martin*, 195 F.3d 1208, 1220 (10th Cir. 1999) (denying qualified immunity because "knowledge" of sexual harassment "and subsequent inaction is sufficient to establish supervisory liability under § 1983"))). So, on the current record, Ms. Seddon isn't entitled to qualified immunity.

## IV.   Conclusion

In sum, plaintiff has alleged a plausible Title VII hostile work environment claim against defendants KDADS and the State of Kansas (Count I). For the § 1981 claim (Count IV), plaintiff has alleged sufficient facts to overcome Ms. Seddon's assertion of qualified immunity at this stage. But she hasn't overcome Ms. Dipman's and Mr. Fox's assertions of qualified immunity. So, the court dismisses with prejudice[4] the § 1981 claims against those defendants and dismisses Ms. Dipman and Mr. Fox from this lawsuit.

---

[4]   Generally, "a dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile[.]" *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014) (quotation cleaned up). Plaintiff requests that, if the court dismisses any of her claims, that it do so without prejudice to give her "an opportunity to cure any

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' "Motion to Dismiss Counts I and IV of Plaintiff's Complaint" (Doc. 10) is granted in part and denied in part, as explained in full by this Order.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendants Lesia Dipman and John Fox are dismissed from this lawsuit, consistent with the details of this Order.

**IT IS SO ORDERED.**

**Dated this 26th day of May, 2022, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree
United States District Judge**

---

defective claims." Doc. 17 at 20. But plaintiff already had such an opportunity after defendants filed their Motion to Dismiss. Rather than amend her Complaint in response to the motion (as was her right under Fed. R. Civ. P. 15(a)(1)(B)), plaintiff chose to litigate the motion on the merits. That choice leads the court to conclude that amendment here is futile. Also, plaintiff doesn't identify any alleged facts that would shore up her § 1981 claims against Ms. Dipman or Mr. Fox. The court need not grant leave to amend where plaintiff "fail[s] to identify the specific factual allegations [she] would allege in an amended complaint." *Carroll v. Lawton Indep. Sch. Dist. No. 8*, 805 F.3d 1222, 1231 (10th Cir. 2015). So, the court dismisses plaintiff's § 1981 claims against Ms. Dipman and Mr. Fox with prejudice.