# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

NGOZI IWEHA,

        Plaintiff,

v.                                                                      Case No. 21-1228-DDC

STATE OF KANSAS, et al.,

        Defendants.

---

## MEMORANDUM AND ORDER

Plaintiff Ngozi Iweha accuses defendants State of Kansas, Kansas Department of Aging and Disability Services (KDADS), and Mary Seddon, of subjecting her to a hostile work environment and discriminating against her, violating Title VII of the Civil Rights Act of 1964 and 42 U.S.C.§ 1981. Before the court is defendants' Motion for Summary Judgment (Doc. 64) and supporting memorandum (Doc. 65). Plaintiff has responded (Doc. 70). And defendants have replied (Doc. 73). For reasons described below, the court grants defendants' summary judgment motion.

## I.    Background

The following facts are uncontroverted or, where controverted, are stated in the light most favorable to plaintiff, the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Larned State Hospital (LSH) employed plaintiff as a staff pharmacist from September 2017 until August 3, 2020. Doc. 63 at 2 (Pretrial Order ¶ 2.a.ii.). The state agency KDADS manages LSH's administration. *Id.* (Pretrial Order ¶ 2.a.iii.). Defendant Mary Seddon served as pharmacist-in-charge at LSH. *Id.* (Pretrial Order ¶ 2.a.iv.). In this role, Ms. Seddon worked as

plaintiff's direct supervisor from May 2018 to April 3, 2020.  *Id.*  LSH employed two other staff pharmacists while plaintiff worked there—John Fox and Janet Finger.  *Id.* (Pretrial Order ¶ 2.a.v.).

While Ms. Seddon oversaw the LSH pharmacy, the staff pharmacists' hours varied.  Mr. Fox worked a 7:00 a.m. to 3:30 p.m. shift.  Doc. 65-2 at 1 (Seddon Aff. ¶ 4).  Because he arrived first, Mr. Fox began each day filling prescriptions that had arrived overnight.  *Id.*  Ms. Finger worked from 7:30 a.m. to 4:00 p.m. each day.  *Id.* (Seddon Aff. ¶ 6).  Plaintiff worked an 8:00 a.m. to 4:30 p.m. shift.  *Id.* (Seddon Aff. ¶ 7).  And Ms. Seddon worked the same shift as plaintiff—8:00 a.m. to 4:30 p.m.  *Id.* at 2 (Seddon Aff. ¶ 14).

### *Alleged Discrimination*

Plaintiff alleges that while she worked in the LSH pharmacy, her coworkers and her supervisor discriminated against her because of her race or national origin.  Plaintiff was born in Nigeria and is Black.[1]  *Id.* at 2 (Pretrial Order ¶ 2.a.i.).  Plaintiff contends that she faced many instances of discrimination and harassment while working in LSH's pharmacy from 2019 to 2020.  Doc. 65-15 at 2–3.  In general, plaintiff complains that her coworkers treated her with hostility and rudeness, excluding her from conversations and activities in the pharmacy.  *Id.*  More specifically, plaintiff alleges that the other pharmacists subjected her to derogatory questions and comments about her heritage and race.  *Id.*

Plaintiff believes that Ms. Seddon, Mr. Fox, and Ms. Finger didn't treat her equally.  Doc. 65-4 at 9 (Iweha Dep. 37:8–11).  She testified that they questioned her qualifications.  *Id.* (Iweha Dep. 37:15–23).  For example, Mr. Fox asked plaintiff if Nigeria had schools, and where she

---

[1]      Plaintiff identifies herself as Nigerian and Black.  Doc. 63 at 2 (Pretrial Order ¶ 2.a.i.); Doc. 70 at 16.  The court adopts plaintiff's terminology, describing her racial identity as Black and her national origin identity as Nigerian.

attended pharmacy school.  *Id.* at 10–12 (Iweha Dep. 38:5–25, 40:1–41:12).  In one instance, he

asked a pharmacy technician to watch the queue[2] instead of plaintiff; and, plaintiff believed he

used "every opportunity to question [her] training [and her] intelligence[.]"  *Id.*  While plaintiff

remembered Mr. Fox asking the specific question—where she attended pharmacy school—just

one time, she testified that he questioned the "quality of [her] education" other times, in other

ways.  *Id.* at 15 (Iweha Dep. 45:1–24).  Plaintiff testified that her coworkers asked her other

demeaning questions about Nigeria.  For example, Mr. Fox asked her if Nigeria had a currency,

and Ms. Seddon asked her where she learned to speak English.  *Id.* at 14 (Iweha Dep. 43:1–18).

Plaintiff testified about specific incidents of discrimination by each pharmacist.  She

alleges that Mr. Fox once brought "slave trade beads to work."  Doc. 70-2 at 29 (Iweha Dep.

29:4–5).  She alleges that Ms. Finger once asked if she ever washed her hair.  Doc. 65-4 at 14

(Iweha Dep. 43:19–23).  And she also testified that Ms. Seddon made an offensive comment

about Nigerian women and reacted with disgust about the national holiday recognizing Martin

Luther King, Jr.  Doc. 70-2 at 28 (Iweha Dep. 28:5–10).

 Plaintiff testified that Mr. Fox "brought slave trade beads to work" and once placed

Peeps marshmallow candy on plaintiff's desk to mock her.  Doc. 70-2 at 29 (Iweha Dep. 29:4–

5); *id.* at 76–78 (Iweha Dep. 76:11–78:21).  Mr. Fox collects jewelry as a hobby, and he owns

beads that he believes may originate from the slave trade in Africa.  Doc. 65-5 at 1 (Fox. Aff. ¶

6).  He asked plaintiff if she wanted to see them once, and she declined his offer.  *Id.*  Mr. Fox

brought beads to work one day, and called them "trade beads."  Doc. 70-2 at 29–30 (Iweha Dep.

---

[2]     As one of their primary tasks, LSH pharmacists verified prescription orders.  Doc. 65-2 at 3
(Seddon Aff. ¶ 33).  LSH pharmacists verified orders through a "patient portal."  Doc. 65-2 at 3 (Seddon
Aff. ¶ 31).  The pharmacists referred to the patient portal as the "queue."  *Id.*  One pharmacist could
access the patient portal or queue at a time, so normally only one pharmacist at a time would work on an
order in that queue.  Doc. 65-5 at 2 (Fox Aff. ¶ 16).

29:21–30:9).  In response, either plaintiff or Mr. Fox said the beads "were being used for during the slave trade."  *Id.*  Plaintiff told him that she found it "very insensitive" for him to bring the beads to work and tell her they represented her "heritage."  *Id.* at 30 (Iweha Dep. 30:1–9). Plaintiff informed Mr. Fox that bringing the beads to work was "not appropriate" because people paid for those beads with their lives.  *Id.* at 33 (Iweha Dep. 33:11–17).  In response, plaintiff said Mr. Fox "blew it off" and she couldn't remember any further interaction about the beads.  *Id.* at 33–35 (Iweha Dep. 33:13–35:20).[3]

Plaintiff's next allegation against Mr. Fox involves a possible weaponization of Easter candy marshmallows—Peeps.  For context, plaintiff sometimes referred to her coworkers as "peeps."  Doc. 70-2 at 76–78 (Iweha Dep. 76:11–78:21).  She used the term "hey, peeps" or "peeps" to mean "hey, friends."  *Id.*  One day, she said "Hey peeps, what are we doing today?" *Id.*  And Ms. Seddon walked out of her office and yelled at plaintiff, "Don't call me peeps.  I'm not peeps."  *Id.*  This response shocked plaintiff.  *Id.*  About that time, Mr. Fox placed Peeps, the Easter candy, on plaintiff's desk.  *Id.*  Plaintiff admits he did this around Easter but testified that she thought "maybe he was trying to use my peeps, because [she] said the word 'peeps.'"  *Id.* at 78 (Iweha Dep. 78:1–10).

Plaintiff testified that Ms. Finger "once asked [her] if [she] ever washed [her] hair."  Doc. 65-4 at 14 (Iweha Dep. 43:19–23).  She said that she "felt insulted" by the question but remained calm and informed Ms. Finger that "African hair is cared for differently."  *Id.* (Iweha Dep. 43:19–25).  Ms. Finger recalled this encounter a bit differently.  According to Ms. Finger, one day plaintiff arrived at the pharmacy with long braids in her hair—different from her normal hair

---

[3]      Plaintiff testified that she couldn't recall if she ever told Ms. Seddon about the bead incident with Mr. Fox.  Doc. 70-2 at 35–36 (Iweha Dep. 35:21–36:10).  She also didn't recall going to HR about the bead incident.  *Id.* at 36 (Iweha Dep. 36:15–21).

style—and Ms. Finger asked her how she washed her hair with it in those braids.  Doc. 65-3 at 2 (Finger Aff. ¶ 17).

Finally, plaintiff alleges that her supervisor subjected her to derogatory comments about her national origin and race.  Ms. Seddon once said to plaintiff, "Nigerian women do not go to school.  The few who do get educated are bossy."  Doc. 65-4 at 2 (Iweha Dep. 23:15–20).  Plaintiff also claims that her supervisor had an offensive reaction to the idea of Martin Luther King, Jr. Day.  Plaintiff testified that Ms. Seddon gave her something to work on and said something like "on Monday, we'll do this and do that," and plaintiff replied that "Monday is Martin Luther King holiday."  Doc. 65-4 at 35 (Iweha Dep. 74:1–25).  Ms. Seddon then looked at her, as plaintiff describes, "in disgust" and said, "Is that a holiday?"  *Id.*

In addition to these specific examples, plaintiff claims that each of her coworkers subjected her to many similar incidents of discrimination or harassment, but she couldn't recall specific details about them.  *See* Doc. 70-2 at 22, 37–38, 44–46 (Iweha Dep. 22:19–24) (describing the "discrimination [she faced] is broad in that so many of them, and it goes back to . . . 2018"); (Iweha Dep. 37:8–38:13) ("[T]here are so many instances [of coworkers questioning her qualifications] . . . an instance I can remember today . . . ."); (Iweha Dep. 44:16–45:24) ("How many times did [Mr. Fox] ask you [plaintiff] where you went to pharmacy school?  Like I said, there are so many instances of these questions . . . ."); (Iweha Dep. 46:5–10) ("I remember [Ms. Finger asking about her hair] that one time, but there were other instances of this—there were other instances.  I can't put them all together today.  I can't remember them all together today, but I remember that one that instance.").

Plaintiff also alleges that her supervisor and coworkers excluded her from conversations about pharmacy operations and in one instance excluded her from a work project.  Doc. 70-2 at

50 (Iweha Dep. 50:2–51:21).  Plaintiff asserts that this exclusion affected her ability to do her job because she wasn't informed.  *Id.*  Plaintiff explained one instance where Ms. Seddon excluded her from "the running of the pharmacy."  *Id.* at 52–53 (Iweha Dep. 52:4–53:2).  A Kansas University consultant assisted with LSH pharmacy projects; and once, Ms. Seddon called Mr. Fox and Ms. Finger to discuss the KU projects.  *Id.*  Plaintiff overheard the call and asked if she could participate in the projects.  *Id.*  In response, Ms. Seddon emailed plaintiff a "random document" which plaintiff believed was in attempt to exclude her.  *Id.*  After plaintiff told Ms. Seddon the document didn't make sense, Ms. Seddon sent the correct document and plaintiff then worked on the KU project.  *Id.* at 52–55 (Iweha Dep 52:14–55:15).

### Plaintiff's Reports to Ms. Seddon

Plaintiff complained to Ms. Seddon about her coworkers' behavior.  Doc. 70-2 at 67 (Iweha Dep. 67:12–25).  She often went to Ms. Seddon "to talk with her about the way [she] was being treated in the pharmacy."  *Id.*  When asked if she ever used the words "racial" or "national origin discrimination" or "harassment" during those conversations, plaintiff replied that she couldn't recall her exact wording, but she "made it known that [she] was being discriminated against."[4]  *Id.* at 68 (Iweha Dep. 68:1–12).  Specifically, plaintiff recalled reporting an incident where Mr. Fox asked a pharmacy technician to watch the queue instead of her.  Doc. 65-4 at 13 (Iweha Dep. 42:3–20).  Plaintiff told Ms. Seddon she found Mr. Fox's behavior "was discriminatory against" her.  *Id.*  Plaintiff told Ms. Seddon she felt "excluded from discussions in the pharmacy" and that it "affected [her] ability to do [her] job" because Ms. Seddon expected her to know what was going on when she wasn't informed.  *Id.* at 19 (Iweha Dep. 51:1–21).

---

[4]     Plaintiff testified that she made all her reports to her supervisor, Ms. Seddon, about harassment in oral conversations.  Doc. 70-2 at 80 (Iweha Dep. 80:16–21).

According to plaintiff, she got the impression "it was . . . no use going to [Ms. Seddon], because she always blew. . . off" plaintiff's complaints.  Doc. 70-2 at 121 (Iweha Dep. 121:13–19).

Ms. Seddon recalls that plaintiff complained occasionally to her about her coworkers. For example, plaintiff complained to Ms. Seddon that Mr. Fox and Ms. Finger excluded her from tasks.  Doc. 65-2 at 3 (Seddon Aff. ¶¶ 34–35).  And whenever plaintiff complained about her coworkers, Ms. Seddon attempted to address the complaint informally with the party plaintiff had complained about.  *Id.* (Seddon Aff. ¶ 36).  Ms. Seddon explained that she supervised informally, and when she received complaints, she often didn't document them and instead addressed the complaints one on one with the pharmacy employees.  Doc. 65-2 at 2 (Seddon Aff. ¶ 8).  For example, Ms. Seddon recalled plaintiff telling her about Mr. Fox "having a discussion about beads" where "[h]e thought he was including her [while] [s]he thought she was offended[;]" and in response Ms. Seddon "told [Mr. Fox], look, she's offended, stop it."  Doc. 70-4 at 74 (Seddon Dep. 74:2–12).  After that, as far as Ms. Seddon knew, "he stopped it[.]"  *Id.*

Except for her informal conversations with her supervisor, plaintiff didn't file complaints, formal or informal, with anyone else at defendants' facilities.  Plaintiff never contacted human resources about any alleged harassment.  Doc. 65-4 at 36 (Iweha Dep. 82:12–19).  Plaintiff conceded that an email on August 6, 2020—after her termination—represented the first time she reported systemic racism or defamation of her character to KDADS.  Doc. 65-4 at 46 (Iweha Dep. 107:11–25).  She also testified that while LSH employed her, she never complained to anyone in human resources.  *Id.* at 36 (Iweha Dep. 82:2–19).

### Plaintiff Posting Governor Kelly's Letter Condemning Racism

After George Floyd's death, Governor Kelly sent a letter to all Kansas employees addressing the tragedy and systemic racism.  Doc. 70-14 (Governor Kelly's Letter).  In it, the

Governor recognized the potential for "racial inequality and intolerance in Kansas" workplaces and aimed to "develop a strategy for how to create change" in the state. *Id.* Plaintiff found the letter reassuring, so she made a copy and posted it on her workstation. Doc. 70-2 at 117 (Iweha Dep. 117:6–13). Plaintiff later learned—after her termination and reading the results of defendants' investigation—the Governor's letter she posted made her coworkers uncomfortable. *Id.* at 117–118 (Iweha Dep. 117:6–118:15). Mr. Fox testified that he wasn't personally offended by the letter, but some of the pharmacy technicians "were quite offended by it." Doc. 70-5 at 152 (Fox Dep. 152:23–25). He opined that plaintiff's decision to post the letter was "inflammatory . . . to a crowd like that" because "some of the [technicians] are pretty redneck[.]" Doc. 70-5 at 151 (Fox Dep. 151:8–25).

### *March 25, 2020 Report of Plaintiff's Workplace Conduct*

On March 25, 2020, Mr. Fox and a pharmacy technician, Lynette Lewis, complained to LSH employee relations manager, Susanne Prescott, about plaintiff. Doc. 65-6 at 1 (Prescott Aff. ¶¶ 1–2). Mr. Fox believed that plaintiff was creating a hostile work environment, and their supervisor, Ms. Seddon, wasn't documenting workplace issues comprehensively. Doc. 65-5 at 2 (Fox Aff. ¶ 9). So, he took matters into his own hands, and reported to human resources. *Id.* Mr. Fox provided a list of complaints he had about plaintiff. Doc. 65-6 at 1 (Prescott Aff. ¶ 3). It included "her conduct in the lab, her unwillingness to [act as] a team player and work with others, and her creation of a hostile work environment." *Id.* Ms. Prescott didn't investigate these allegations further, at the time, because she found Mr. Fox and Ms. Lewis's complaints too vague. *Id.* (Prescott Aff. ¶ 5). And, before launching an investigation, Ms. Prescott had to learn whether Ms. Seddon—plaintiff's direct supervisor—had addressed the issues first. *Id.*

After discussing Mr. Fox's complaints with Ms. Seddon, Ms. Prescott learned that Ms. Seddon had spoken with plaintiff on several occasions about her behavior but hadn't documented these conversations or "implemented any formal corrective action." *Id.* at 2 (Prescott Aff. ¶ 7). From there, Ms. Seddon and Ms. Prescott developed a plan to establish clearer expectations for employees in the pharmacy. *Id.* (Prescott Aff. ¶ 9). Ms. Prescott also told Ms. Seddon to encourage her employees to document "dates, times, and what they had observed" for future complaints about their coworker. *Id.* Mr. Fox reported that after his meeting with Ms. Prescott, he took notes of issues he had with plaintiff, "such as her coming to work late or surfing the internet." Doc. 65-5 at 2 (Fox Aff. ¶ 10).

As one consequence of this instruction, plaintiff noticed that her coworkers started "observering [her] every move" which made her feel like she worked "under a microscope[.]" Doc. 70-2 at 60 (Iweha Dep. 60:2–9). She thought that Ms. Finger, Ms. Seddon, and Mr. Fox looked up every time she got up from her chair. *Id.* (Iweha Dep. 60:11–18). Later, she confirmed her suspicions when she learned that Mr. Fox and Ms. Finger had kept logs of her behavior. *Id.*

### *Objective Performance Metrics*

In June 2020, Ms. Seddon met with the three staff pharmacists—plaintiff, Mr. Fox, and Ms. Finger—to discuss implementing a new performance review system. Doc. 63 at 2 (Pretrial Order ¶ 2.a.vii.). Ms. Seddon informed her employees that they'd undergo the KDADS Performance Review Form (PRF) for pharmacists. *Id.* Ms. Seddon designed the PRFs to measure objective criteria; criteria she believed the staff pharmacists could achieve regardless of when they came into work each morning. Doc. 65-2 at 2 (Seddon Aff. ¶¶ 10, 12). Important

here, the PRF monitored the number of prescriptions each pharmacist filled.  Doc. 63 at 2 (Pretrial Order ¶ 2.a.vii.).

When Ms. Seddon met with plaintiff about the PRFs, plaintiff agreed that they were reasonable.  Doc. 65-2 at 2 (Seddon Aff. ¶ 13).  But plaintiff raised a concern that the other two pharmacists—who came in earlier than she did—had an unfair advantage because between seven and eight o'clock a.m., they could verify orders that had arrived overnight.  *Id.*  To address plaintiff's concern, Ms. Seddon instructed Mr. Fox to leave a portion of overnight orders unfilled so that plaintiff could fill them when she arrived at 8:00 a.m.  *Id.*  Mr. Fox complied with this request, and left prescription orders for plaintiff to fill, but he found that often those prescriptions remained unverified "long after [plaintiff] arrived at work and Ms. Finger or [Mr. Fox] would end up verifying [the orders] anyway."  Doc. 65-5 at 2 (Fox Aff. ¶¶ 14–15).

For the first five months of 2020, records establish that plaintiff verified 3,514 prescriptions.  Doc. 65-6 at 171.  In the same time frame, Mr. Fox verified 18,925 prescriptions; Ms. Finger verified 9,874 prescriptions; and Ms. Seddon verified 5,395 prescriptions.  *Id.*  Ms. Seddon spent 40% of her time verifying prescription orders, while the staff pharmacists spent 70% of their time verifying orders.  *Id.*  Thus, Ms. Seddon's numbers should reflect about half of a staff pharmacist's numbers.  *Id.*

### June 10, 2020 Incident at the Pharmacy

On June 10, 2020, plaintiff and Mr. Fox were involved in an incident at the pharmacy. Doc. 63 at 2 (Pretrial Order ¶ 2.a.viii.).  That same day of the incident, LSH placed plaintiff on administrative leave while it investigated the incident.  *Id.* (Pretrial Order ¶ 2.a.ix.); *see also* Doc. 65-19 (Notice of Placement on Administrative Leave).  LSH didn't place Mr. Fox on administrative leave, discipline him, or warn him for his role in the incident.  Doc. 63 at 2

(Pretrial Order ¶ 2.a.ix.).  Ms. Prescott conducted the investigation.  *Id.* at 2–3 (Pretrial Order ¶ 2.a.x.).

The full story of the June 10 incident begins a few days earlier.  On June 8, plaintiff worked as the only pharmacist from 4:00 to 4:30 p.m. because Ms. Seddon was out of office for a personal matter.  Doc. 65-2 at 2 (Seddon Aff. ¶ 15).  With Ms. Seddon out of the office, plaintiff thought that Ms. Finger and Mr. Fox would stay until 4:30 p.m. to help her with the pharmacy.  Doc. 65-4 at 39–40 (Iweha Dep. 87:15–89:11).  But they didn't stay, leaving at their normal, earlier departure times.  *Id.*

The others leaving her to staff the pharmacy by herself prompted plaintiff to contact Ms. Seddon to ask about the plan for pharmacist coverage.  *Id.* at 40 (Iweha Dep. 89:1–15).  So, a bit after four o'clock p.m. on June 8, plaintiff emailed Ms. Seddon about coverage in the pharmacy—although no law or policy required two pharmacists in the pharmacy at a time, Ms. Seddon knew plaintiff didn't like working as the only pharmacist.  Doc. 65-2 at 2 (Seddon Aff. ¶¶ 16–17); *see also id.* at 12 (June 8 email).  Ms. Seddon didn't respond immediately to plaintiff's email.  *Id.* at 2 (Seddon Aff. ¶ 17).

Two days later, on June 10, plaintiff emailed all LSH pharmacists—Ms. Seddon, Mr. Fox, and Ms. Finger—requesting that the pharmacists rotate responsibility for coming in early.  *Id.* at 2 (Seddon Aff. ¶ 18); *see also id.* at 13 (Iweha June 10 email).  She cited new PRFs, counting the number of prescriptions each pharmacist verified.  *Id.* at 2 (Seddon Aff. ¶ 18); *see also id.* at 13 (Iweha June 10 email).  Ms. Seddon replied, informing plaintiff that she would discuss it with LSH's medical director, Dr. Burke.  *Id.* at 2 (Seddon Aff. ¶ 19); *see also id.* at 14 (Seddon's first June 10 email).  Ms. Seddon also called the pharmacy to ask Mr. Fox and Ms. Finger for their thoughts about rotating schedules.  *Id.* at 2 (Seddon Aff. ¶¶ 19–20).  Both

expressed a preference for their current schedules—arriving and leaving earlier—but informed their supervisor that they'd rotate if she requested that they do so.  *Id.*

Dr. Burke recommended that Ms. Seddon not make any changes to the pharmacists' schedules while she was out of office.  Doc. 65-2 at 3 (Seddon Aff. ¶ 23).  So, Ms. Seddon responded again to plaintiff's email and informed her that they'd conduct a team meeting to discuss rearranging the schedules upon her return.  *Id.*; *see id.* at 15 (Seddon's second June 10 email).  But until then, the schedules would remain unchanged.  *Id.* at 3 (Seddon Aff. ¶ 23); *see id.* at 15 (Seddon's second June 10 email).  To assuage plaintiff's concerns about the early morning advantage for prescription quotas, Ms. Seddon informed plaintiff that she wouldn't start recording the pharmacist's prescription count PRF until July.  *Id.* at 3 (Seddon Aff. ¶ 24); *id.* at 15 (Seddon's second June 10 email).

According to Ms. Finger and Mr. Fox, the morning of June 10, plaintiff had selected many orders on the patient profile; they thought plaintiff did so "to prohibit Mr. Fox or [Ms. Finger] from working on" the orders.  Doc. 65-3 at 2 (Finger Aff. ¶ 14); Doc. 65-5 at 3 (Fox. Aff. ¶ 22).  By the time their supervisor called to check in with Mr. Fox and Ms. Finger about rotating schedules, tensions in the pharmacy had reached a boiling point.  Drama ensued.  Each pharmacist involved recounted his or her version of the story.[5]

According to plaintiff, when Ms. Seddon called the pharmacy on the morning of June 10, she first spoke to Ms. Finger then to Mr. Fox.  Doc. 70-2 at 94 (Iweha Dep. 94:10–24).  When Mr. Fox reached the phone, plaintiff overheard Mr. Fox tell their supervisor that plaintiff "was

---

[5]    The court first presents plaintiff's version of the June 10 incident.  At this summary judgment stage, where the parties present conflicting facts (*i.e.*, plaintiff's version of the story versus the other pharmacists' version of the story), the court accepts plaintiff's version as true.  *See Scott*, 550 U.S. at 378.  But nonetheless, the court recites each version of the story here because the different versions supply necessary context for the HR investigation by the two organization defendants.

holding up the queue[.]" *Id.*  Plaintiff, of course, didn't think she was holding up the queue, and

so she walked over to the phone to try to explain to Ms. Seddon what she was actually doing—

checking drug interactions to make sure they could send the prescriptions requested. *Id.*  After

this explanation, Mr. Fox got mad at plaintiff and started yelling at her and pointing his finger at

her with a red face. *Id.*  After he hung up with Ms. Seddon, Mr. Fox approached plaintiff and

yelled at her. *Id.* at 95 (Iweha Dep. 95:1–20).  He yelled at her, and among other things said, "if

you want war, I'll give you war[.]" *Id.*  During this encounter, Ms. Finger stood still on the other

side of the room. *Id.*  Plaintiff claims she talked to Mr. Fox in a calm voice and tried to explain

that she was just doing her job. *Id.* at 96 (Iweha Dep. 96:2–15).  Plaintiff shook from fear after

he spoke to her in that way. *Id.*  Then Mr. Fox returned to his chair, and plaintiff retreated to the

bathroom to calm herself down. *Id.*

According to Ms. Finger, when Ms. Seddon called the pharmacy to ask about rotating

work schedules, plaintiff "came over near" her and "glared angrily" at her and Mr. Fox.  Doc.

65-3 at 2 (Finger Aff. ¶ 13).  Ms. Finger asserted that she and Mr. Fox attempted to talk to

plaintiff about how they all could work together, and plaintiff spoke "very aggressively and

angrily" to the two other pharmacists and told them she had to lock up the queue to meet her

numbers. *Id.* (Finger Aff. ¶ 15).  Mr. Fox recounted the same version of the story.  Doc. 65-5 at

3 (Fox Aff. ¶ 21) (when Ms. Seddon called to discuss rotating schedules, plaintiff "came over

near Ms. Finger and [Mr. Fox] and glared angrily").  Ms. Finger and Mr. Fox maintained that

neither acted aggressively toward plaintiff on June 10; instead, plaintiff "was rude and aggressive

towards" them.  Doc. 65-3 at 2 (Finger Aff. ¶ 16); Doc. 65-5 at 3 (Fox Aff. ¶ 23).  Mr. Fox

admitted that he said to plaintiff "if you want war, I'll give you war."  Doc. 65-17 at 3 (Yeakley

Report).  He contends this comment referenced the battle between the pharmacists about numbers of prescriptions each verified and the ongoing saga about holding up the queue.  *Id.*

Two pharmacy technicians also witnessed and then reported the incident between Mr. Fox and plaintiff.  Doc. 65-6 at 2 (Prescott Aff. ¶ 10).  Ms. Lewis—the pharmacy technician who had already reported plaintiff a few months earlier—and Kelly Lopez reported plaintiff's behavior to LSH superintendent Lesia Dipman.  Doc. 70-5 at 93 (Fox Dep. 93:12–23).  Ms. Dipman instructed the technicians to report to HR.  *See id.*  The two technicians arrived at the HR office "frustrated and upset, complaining that [plaintiff] was acting completely inappropriately."  Doc. 65-6 at 2 (Prescott Aff. ¶ 10).  They reported to Ms. Prescott that plaintiff shouted at Mr. Fox while Mr. Fox stood there and tried to talk calmly to plaintiff.  *Id.* (Prescott Aff. ¶ 11).  Ms. Lopez and Ms. Lewis described plaintiff's behavior as "confrontational," "alarming," and indicated that they felt "unsafe with her in the pharmacy" and were "tired of the hostile work environment" that they believed plaintiff had created.  *Id.* (Prescott Aff. ¶¶ 10, 12).[6]

### Prescott Investigation & Relevant KDADS Policies

After the technicians' report, Ms. Prescott conducted an investigation of the June 10, 2020 incident in the pharmacy.  Doc. 63 at 2–3 (Pretrial Order ¶ 2.a.x.).  She interviewed all of LSH's pharmacists—plaintiff, Ms. Seddon, Mr. Fox, and Ms. Finger.  *Id.*  She also interviewed pharmacy staff who witnessed the incident—Ms. Lewis, Ms. Lopez, Sarah Schwartz, and Casey Shaffer.  *Id.*  Based on her investigation, Ms. Prescott concluded ultimately that LSH should terminate plaintiff's employment.  *Id.*

---

[6]     Plaintiff contests Ms. Lopez and Ms. Lewis's characterization of the June 10 incident but she doesn't contest that Ms. Lopez and Ms. Lewis reported their characterization to Ms. Dipman then Ms. Prescott on June 10, 2020.  Again, the court must view the facts in a light most favorable to plaintiff, but includes this necessary context to defendants' investigation.

Ms. Prescott interviewed plaintiff on June 10, immediately before LSH placed plaintiff on administrative leave.  Doc. 65-6 at 2 (Prescott Aff. ¶ 15).  During this interview, plaintiff didn't complain about discrimination based on race or national origin; she only complained about feeling excluded and the lack of coverage without Ms. Seddon in the office.  *Id.* (Prescott Aff. ¶ 15).

Ms. Prescott's investigation spanned more than a month.  Doc. 65-6 at 6 (Prescott Investigation Report).  After conducting this investigation, Ms. Prescott testified to the following conclusions about plaintiff's performance as a staff pharmacist:  she would regularly refuse to complete basic tasks expected of staff pharmacists (for example, she refused to supply LSH emergency boxes with certain medications); she completed little to no work between 4:00 and 4:30 p.m. each day (and on at least one occasion refused to fill an urgent medication order during this time period); she "cherry pick[ed]" easier duties; completed tasks she found desirable, forcing her coworkers to pick up the slack; and she created a hostile work environment that impeded others' work performances.  *Id.* at 2–3 (Prescott Aff. ¶¶ 16–21).

Ms. Prescott's written report included the following allegations plaintiff's coworkers made against her:

- Time abuse—plaintiff arrived late consistently, misreported her arrival time, left work early, and took extended breaks.

- Plaintiff had "left at 4:30 with outstanding orders not reviewed or processed."

- She had "an attitude that patient care is not a priority unless it is something that would affect her license."

- Verbal abuse towards coworkers—plaintiff "yell[ed] at others, especially [Mr.] Fox," and used an unprofessional tone and volume.  "Techs and [a] [p]harmacist have all reported that [plaintiff] screamed in [Ms. Seddon's] face while [Ms. Seddon] was trying to resolve issues with her or assign tasks."

- Plaintiff acted in a physically aggressive manner with coworkers.

15

- Plaintiff cherry picked duties and refused to do some duties.

- She refused "to take turns working [h]olidays" and put "time off on the [c]alendar without approval from her supervisor."

- Plaintiff completed schoolwork or other projects for class credit during work hours.

- She wouldn't complete special drug projects that Ms. Seddon asked the pharmacists to do.

- Plaintiff posted "signs and quotes that staff interpret as demonstrating she is a protected class."

- She clicked on orders—locking them—then would take breaks, allowing the orders to sit, so other pharmacists couldn't work on orders.

- She completed a small portion of the overall pharmacist workload.

- She refused to answer the pharmacy's phone but took personal phone calls.

- She slept in the break room at work.

- She added "tension and unease throughout the department with her presence and having a bad attitude."

- Plaintiff "surf[ed] the internet excessively."

- She printed entire textbooks for school using the pharmacy's color printer.

Doc. 65-6 at 6–8 (Prescott Investigation Report).  Ms. Prescott concluded her investigation on

July 20, 2020.  *Id.* at 6 (Prescott Investigation Report).

Ms. Prescott investigated plaintiff for alleged violations of three policies from the

KDADS State Hospital Employee Policy Manual:

- "3.8 Employee Conduct" (Doc. 65-8)

- "4.8 Use of Computer Equipment, Fax Machines and Telephones" (Doc. 65-9)

- "3.8 K Sleeping on Duty" (Doc. 65-8 at 3)

Doc. 65-6 at 6 (Prescott Investigation Report).  Ms. Prescott also investigated plaintiff for

allegedly violating three LSH Pharmacy Policies:

16

- G-15:  "Emergency Boxes and Poison Control Boxes." (Doc. 65-10)
- G-12:  "Formulary" policy instructing pharmacy personnel to provide "same day delivery of all formulary medications prescribed for individual patients." (Doc. 65-11)
- Internet Usage Agreement

Doc. 65-6 at 6 (Prescott Investigation Report).  Ms. Prescott found that plaintiff violated these policies and ultimately recommended that LSH terminate plaintiff's employment.  Doc. 63 at 2–3 (Pretrial Order ¶ 2.a.x.); Doc. 65-6 at 22 (Prescott Investigation Report).

To investigate these alleged violations, Ms. Prescott, in addition to the interviews, conducted a phone audit and an IP address search.  Doc. 70-12 at 32 (Prescott Dep. 32:3–19).  She explained that the phone audit was limited because they only had access to a limited quantity of data.  *Id.*  Through the IP address search, Ms. Prescott found that plaintiff used her computer to do a lot of schoolwork, surf the internet, and shop online during work hours.  *Id.* at 58 (Prescott Dep. 58:1–14).  Her investigation also located a key card record that recorded when plaintiff swiped her ID card to enter and exit the pharmacy.  Doc. 70-12 at 32 (Prescott Dep. 32:3–19).

KDADS's Employee Policy 3.6 "Disciplinary Action" governs defendants' discipline of employees.  Doc. 70-19.  In relevant part, it states:

> Progressive discipline is discipline administered in stages, starting from the least severe progressing to the most severe.  Progressive discipline may be administered for violating any KDADS Employee policy or Hospital policy. Progressive discipline includes informal counseling, a written reprimand, change in duties, suspension, demotion and/or dismissal. Where it is not otherwise specified in policy, Human Resources must be notified and consulted immediately after discovery of the violation and prior to the implementation of discipline.
>
> KDADS supervisors will use progressive discipline consistently and reasonably to address work performance deficiencies or detrimental personal conduct.  Prior to implementing progressive discipline, supervisors shall consult with Human Resources.  Depending on the nature/severity of an incident progressive discipline stages may be skipped or repeated as deemed appropriate by the Appointing Authority.

17

Doc. 70-19.  Before June 10, 2020, defendants hadn't formally disciplined plaintiff for

her workplace conduct or job performance.  Doc. 70-12 at 35 (Prescott Dep. 35:2–9).[7]

But each of the three policies that defendants found plaintiff to have violated—3.8, 3.8 K,

and 4.8—provide that first-time violations could result in termination.  *See* Docs. 65-8,

65-9.

### *Plaintiff's Termination*

Ms. Prescott's investigation report recommended that LSH terminate plaintiff's

employment.  Doc. 63 at 2–3 (Pretrial Order ¶ 2.a.x.); Doc. 65-6 at 22 (Prescott Investigation

Report).  Following the report's recommendation, LSH superintendent Lesia Dipman provided

plaintiff with a letter informing her that LSH intended to terminate her employment.  Doc. 65-7

(Dipman Aff. ¶¶ 1, 4–5); *see also id.* at 3–5 (July 24 letter).

On July 24, 2020, LSH sent plaintiff this letter notifying her of her "proposed dismissal."

Doc. 63 at 3 (Pretrial Order ¶ 2.a.xi.).  The letter informed plaintiff that LSH planned to dismiss

her for allegedly violating three provisions of KDADS's policy and one LSH policy:  KDADS

Policy 3.8 Employee Conduct; KDADS Policy 4.8 Use of Computer Equipment, Machines, and

Telephones; KDADS Policy 3.8 K Sleeping on Duty; and LSH Policy 23.0 Use of LSH Intranet.

*Id.* (Pretrial Order ¶ 2.a.xii.).[8]

---

[7]     Although she wasn't disciplined formally before June 10, plaintiff's supervisor had talked to her about not violating these policies.  Ms. Seddon had spoken with plaintiff about sleeping on the job.  Doc. 70-4 at 111 (Seddon Dep. 111:4–17).  Someone also had counseled plaintiff to stop doing schoolwork during working hours.  *Id.* at 137 (Seddon Dep. 137:15–20).

[8]     The following facts are relevant to plaintiff's pretext theory.  Defendants' rationale for terminating her employment was a pretext for discrimination, because defendants treated similarly situated employees more favorably than plaintiff:  (1) In October 2017, defendants issued two "Incident Reports" because pharmacist Mr. Fox failed to follow procedure while verifying medication orders (Doc. 70-10 at 1, 6), and defendants didn't discipline Mr. Fox for these errors (Doc. 70-5 at 119 (Fox. Dep. 119:2–14)); (2) In October 2018, Ms. Seddon's supervisor issued a "counseling memo" for

On July 27, 2020, plaintiff responded to this letter through counsel.  *Id.* (Pretrial Order ¶ 2.a.xiii.); *see also* Doc. 65-12 (Ezeh Letter).  In her response, plaintiff denied that she violated any of these policies.  Doc. 63 at 3 (Pretrial Order ¶ 2.a.xiii.).[9]  In response to the letter from plaintiff's counsel denying these allegations, defendants conducted no further investigation. Doc. 63 at 3 (Pretrial Order ¶ 2.a.xiv.).  LSH terminated plaintiff's employment on August 3, 2020.  *Id.*

Because plaintiff sues Ms. Seddon in her personal capacity, also relevant here is Ms. Seddon's role in plaintiff's termination.  As discussed above, Ms. Seddon exchanged emails with plaintiff and the other staff pharmacists about the team's schedules from June 8 to June 10, 2020. Doc. 65-2 at 3 (Seddon Aff. ¶ 26).  But Ms. Seddon didn't learn about the June 10 incident at the pharmacy or that LSH had placed plaintiff on administrative leave until Ms. Prescott contacted her to investigate that incident.  *Id.* (Seddon Aff. ¶¶ 27–28).  Ms. Seddon "confirmed reports of [plaintiff's] bad workplace behavior" and otherwise answered Ms. Prescott's questions.  *Id.* (Seddon Aff. ¶¶ 29–30).  But she wasn't involved in any discussions considering whether to discipline plaintiff.  *Id.*  She didn't make the decision to terminate plaintiff's employment.  *Id.* Instead, Ms. Dipman—LSH superintendent—issued the July 24 letter notifying plaintiff of her proposed dismissal and terminated plaintiff's employment on August 3.  Doc. 65-7 at 1–2 (Dipman Aff. ¶¶ 1, 5, 9).  Ms. Dipman found Ms. Prescott's report credible and thorough, and

---

insubordination and inappropriate conduct (Doc. 70-22).  The court recites these facts here, because they are otherwise irrelevant to understanding this case's factual background.

[9]     Plaintiff's letter references discrimination but doesn't exactly allege she was a victim of it. Specifically, counsel's letter asserts that plaintiff "is aware that Larned State Hospital is an equal opportunity organization and does not condone or encourage any form of harassment, discrimination or unfair treatment of its employees based on race, faith, color or creed.  Counsel respectfully urge the Superintendent to use her good offices to consider and re-evaluate [plaintiff's] responses to the false allegations . . . Counsel respectfully puts management on notice to handle this matter in a non-discriminatory manner . . . ."  Doc. 65-12 at 10–11.

testified that she "had no reason to disbelieve the allegations that were made against [plaintiff] by her coworkers." *Id.* at 1 (Dipman Aff. ¶ 4).

### August 6, 2020 Email to Sheila Denny

Three days after LSH fired her, plaintiff emailed KDADS employee, Sheila Denny, to air some grievances she had with her former employer. Doc. 63 at 3 (Pretrial Order ¶ 2.a.xv.). In this email, plaintiff asserted that she had experienced "systemic racism and defamation of character" while she worked at LSH's pharmacy. *Id.*; *see also* Doc. 65-14 (August 6 email). The email also asserted that on "June 10, 2020, [plaintiff's] coworker was aggressive to [her] but [she] was the one put on administrative leave while nothing was done to [that coworker]. While on administrative leave, some other false and malicious allegations were made against [plaintiff] to make a case for [her] dismissal." Doc. 65-14 (August 6 email).

### KDADS/ Yeakley Investigation

After plaintiff emailed Ms. Denny, KDADS initiated an investigation into plaintiff's allegations. *See* Doc. 65-18 at 2 (Yeakley Dep. 29:18–23); Doc. 65-17 (KDADS Investigation Report). Hospital Employee Relations Manager Jason Yeakley investigated the June 10 incident between plaintiff and Mr. Fox. Doc. 65-17 at 1, 8 (KDADS Investigation Report). As part of this investigation, Mr. Yeakley interviewed LSH's pharmacists—Ms. Seddon, Ms. Finger, and Mr. Fox. *Id.* at 1–4. He also spoke with LSH's pharmacy technicians—Ms. Lopez and Ms. Lewis. *Id.* at 4. Finally, Mr. Yeakley spoke with plaintiff about the June 10 incident and her allegations of racism at the LSH pharmacy. *Id.* at 5–8. Each individual provided Mr. Yeakley with their version of the June 10 story—each version mostly was the same as the one recited in the section entitled "June 10, 2020 Incident at the Pharmacy."

The court need not repeat here the June 10 events as paraphrased by Mr. Yeakley's report.  But that report does highlight a few relevant findings.  Plaintiff claimed that Mr. Fox pointed at her and wagged his finger in her face while he yelled at her.  Doc. 65-17 at 5, 7.  Mr. Yeakley asked two observers whether they "had observed anyone waving or pointing their finger in anyone else's face."  Both answered no.  Doc. 65-17 at 3 (Ms. Finger said, "I do not recall anyone pointing their finger at anyone else"); *id.* at 4 (Ms. Lopez said, "No.  No one pointed their finger at anyone.").

Mr. Yeakley's investigation found—"[b]ased upon the corroborating evidence from . . . witness statements, and the lack of evidence to support [plaintiff's] claim of racism and hostility in the workplace,"—plaintiff's allegations were unsubstantiated.  *Id.* at 8.  His report recommended the pharmacy staff receive training on "Diversity and Sensitivity."  *Id.*  He also recommended LSH's pharmacy implement a policy to distribute the workload (*a.k.a.* the queue) between the pharmacists formally and a process about how to fill prescription orders with a technician when there is only one pharmacist on duty.  *Id.*

## II.    Legal Standard

Summary judgment is appropriate when the moving party demonstrates "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if

under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.*
(quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary
judgment and the burden of establishing that summary judgment is appropriate as a matter of
law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v.
Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).   To meet this burden, the
moving party "'need not negate the non-movant's claim, but need only point to an absence of
evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO,
Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its
pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those
dispositive matters for which it carries the burden of proof.'"   *Id.* (quoting *Jenkins v. Wood*, 81
F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);
*Anderson*, 477 U.S. at 248–49.   To do so, the non-moving party must identify the facts by
"reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."   *Adler*,
144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th
Cir. 1992)).   "Unsubstantiated allegations carry no probative weight in summary judgment
proceedings."   *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips
v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)).   To survive summary judgment, the non-
moving party's "evidence, including testimony, must be based on more than mere speculation,
conjecture, or surmise."   *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

The federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.  To the contrary, it is an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

## III.  Analysis

Plaintiff has sued defendants Kansas and KDADS, asserting three violations of Title VII. She claims that these defendants subjected her to:  (1) a hostile work environment; (2) disparate treatment; and (3) retaliation because of her complaints about race and national origin discrimination and harassment.  Doc. 63 at 15–18 (Pretrial Order ¶¶ 4.a.i.–iii.).  Plaintiff also asserts that defendant Seddon harassed and discriminated against her based on her race and national origin, violating 42 U.S.C. § 1981.  *Id.* at 18 (Pretrial Order ¶ 4.a.iv.).

Defendants now assert that they're entitled to summary judgment against all claims.  The court first addresses the claims against defendants Kansas and KDADS, then addresses the claims against defendant Seddon.  For reasons explained below, the court grants summary judgment against all of plaintiff's claims.

### A.  Title VII hostile work environment claim

Title VII "makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.'"  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)).  This statute "authorize[s] a plaintiff to bring a claim for hostile work environment based on unlawful race discrimination."  *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015).

Plaintiff argues that other pharmacists at LSH subjected her to continuous derogatory comments and singled her out as the only Black and Nigerian person in the pharmacy—

amounting to a hostile work environment.  Defendants counter, arguing that plaintiff's allegations don't rise to the level of severe or pervasive harassment, necessary for a Title VII hostile work environment claim to survive summary judgment.  The court addresses these competing arguments, in turn, below.

**1.  Is there a genuine dispute whether defendants subjected plaintiff to a hostile work environment under Title VII?**

To survive defendants' summary judgment motion, plaintiff must show that the summary judgment facts permit a reasonable jury to find for her on the following four prima facie elements:

> (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on race; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

*Lounds*, 812 F.3d at 1222 (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (quotation cleaned up) (further citations omitted)).  Here, there's no dispute that plaintiff could satisfy the first three.  Instead, the parties only dispute the last element—whether plaintiff has adduced evidence permitting a jury to find "pervasive and severe" harassment.

The Tenth Circuit has explained that "pervasiveness and severity are independent and equal grounds upon which a plaintiff may establish this element of a hostile environment claim." *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (quotation cleaned up).  But, pervasiveness and severity "'are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.'"  *Id.* (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)).  The court must assess the "severity and pervasiveness of the conduct . . . from both an objective and a subjective perspective."  *O'Shea v.*

*Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).  Neither party appears to challenge whether plaintiff subjectively found her work environment hostile, so the court's analysis here focuses solely on the objective prong.

Determining whether the workplace is an objectively hostile work environment is not "a mathematically precise test."  *Harris*, 510 U.S. at 22.  The court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 23.  And our Circuit's precedent "unmistakably requires" the court to consider overtly racial and facially neutral conduct together.  *Lounds*, 812 F.3d at 1224 ("We have long held that facially neutral abusive conduct can support a finding of racial animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly racially-discriminatory conduct." (quotation cleaned up)).

But, when evaluating hostility, the court must ensure that its review does not turn Title VII into a "general civility code."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted).  Conduct "that is merely offensive" doesn't violate Title VII.  *Harris*, 510 U.S. at 21.  Instead, Title VII only prohibits conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive[.]"  *Id.*  "To survive summary judgment on a claim alleging a racially hostile work environment, [plaintiff] 'must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and that the victim 'was targeted for harassment

because of [her] . . . race[ ] or national origin.'"  *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (quoting *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326–27 (10th Cir. 2004)).

Defendants argue that admissible evidence invoked by plaintiff doesn't rise to the requisite level.  Our Circuit requires evidence that could permit a rational factfinder to conclude LSH's pharmacy "permeated with discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment[.]"  *See Sandoval*, 388 F.3d at 1326–27 (citation and internal quotation marks omitted).  Defendants argue plaintiff falls far short of this standard because the summary judgment facts at most demonstrate "a few isolated incidents of racial enmity or sporadic slurs," but can't amount to "a steady barrage of opprobrious racial comments."  *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (citation and internal quotation marks omitted).

Defendants contend that of the seven episodes of alleged discrimination recited as support for plaintiff's hostile work environment claim at the motion to dismiss stage, the undisputed summary judgment facts now preclude five of those allegations.  Doc. 65 at 27; *see also* Doc. 38 at 8–9.  At the motion to dismiss stage, the court found plaintiff alleged a hostile work environment adequately, based on the totality of the following allegations:

(1) her co-workers' "inappropriate questions about [her] native country of Nigeria[,]" including Mr. Fox's question about how people traded in Nigeria and his bringing "slave trade beads to the workplace, making reference to the slave trade[,]"

(2) Ms. Seddon's repeated derogatory comments about Nigerian women, like "women from Nigeria are not educated and the ones that are, they are bossy[,]";

(3) Ms. Seddon denying plaintiff's requests for a flex schedule and to distribute overnight prescriptions equitably among plaintiff and her white and American-born co-workers;

(4) Ms. Seddon's indifference to plaintiff's complaints of unequal treatment and racially hostile work conditions;

(5) the two incidents in June 2020 when Mr. Fox and Ms. Finger ended work early (allegedly with Ms. Seddon's permission), leaving plaintiff to fill prescriptions by herself, violating pharmacy requirements;

(6) Mr. Fox's frequent complaints that plaintiff was "holding up the prescription queue" when she was performing required cross-checks; and

(7) KDADS suspending plaintiff and eventually terminating her employment after Mr. Fox complained to Ms. Seddon and screamed at plaintiff that if she wanted a war, he'd give her a war.

Doc. 38 at 8–9 (internal citations to the Complaint omitted). Defendants argue that the summary judgment facts indisputably demonstrate that numbered episodes (2), (3), (4), (5), and (7) are false. Here's why.

Ms. Seddon didn't make "repeated" comments; plaintiff testified to just one, single comment about Nigerian women. Ms. Seddon never denied plaintiff's request for a flex schedule.[10] Defendants contend that plaintiff never complained to Ms. Seddon about "racially hostile" work conditions, she complained merely about her coworkers excluding her. Mr. Fox and Ms. Finger didn't leave the pharmacy early in June 2020, they left earlier than plaintiff according to their normal schedule—and, more importantly, no policy required two pharmacists' presence on site. So, it's undisputed that plaintiff's coworkers never forced her to violate a policy. Finally, KDADS suspended plaintiff, but only after two pharmacy technicians and a pharmacist complained about her behavior and it had conducted an independent investigation into her workplace conduct.

---

[10] The factual record simply can't support some of plaintiff's allegations. For example, plaintiff complained that defendants assigned her a shift that didn't allow her to fill as many prescriptions as her coworkers. But it's undisputed that plaintiff didn't ask to modify her schedule to arrive earlier until June 10, 2020, the day LSH placed plaintiff on administrative leave. Doc. 65-2 at 2 (Seddon Aff. ¶ 21). From 2018 until June 10, 2020, plaintiff never had asked Ms. Seddon if she could work an earlier shift, nor had she complained about her coworkers' flex schedules. Doc. 65-2 at 1 (Seddon Aff. ¶ 5); Doc. 65-4 at 42 (Iweha Dep. 93:9–11).

The court agrees with defendants' arguments.  The uncontroverted facts show that plaintiff didn't face these episodes of discrimination—numbers (2), (3), (4), (5), and (7)—as she originally claimed.  But even after knocking out some alleged discrimination, the question remains—has plaintiff adduced enough evidence to support a reasonable jury finding that the LSH pharmacy was "permeated with discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment[?]" *Sandoval*, 388 F.3d at 1326–27 (citation and internal quotation marks omitted).

Plaintiff says the answer is yes.  She contends that the following supply all the requisites of a triable case for a racially hostile work environment:  her coworkers' questions about Nigerian schools and where plaintiff earned her pharmacy degree; Ms. Seddon's statement that Nigerian women are uneducated or, if educated, are bossy; the questions asking whether Nigeria had a recognized currency or people used cars there; plaintiff's perception that the other pharmacists excluded her from meetings and discussions in the pharmacy; and her coworkers logging her activities, building a case against plaintiff, based on instructions from HR.  Plaintiff argues that her coworkers' questions about Nigeria implied she came from an uncivilized country and undermined her qualifications as a pharmacist, and thus humiliated her and affected her job performance.  She contends that her colleagues' conduct excluding her from meetings and discussions prevented her from completing certain job assignments.  Thus, she argues, the alleged hostile work environment affected and altered the terms and conditions of her employment.

Plaintiff also argues that the severity and pervasiveness evaluation of a hostile work environment claim is a fact question unfit for summary judgment.  And indeed, that is true in some cases.  *See O'Shea*, 185 F.3d at 1098 ("the severity and pervasiveness evaluation is

particularly unsuited for summary judgment");[11] *Mestas v. Town of Evansville, Wyo.*, 786 F.

App'x 153, 159 (10th Cir. 2019) (reversing summary judgment against a hostile work

environment claim—where plaintiff's supervisor and other coworkers "repeatedly made

derogatory remarks using racial slurs such as 'beaner,' 'stupid beaner,' and 'dumb Mexican'"

and continued to do so even after plaintiff had complained to her supervisor—explaining that

"which comments made in the workplace rise to the level of discriminatory conduct, and whether

their frequency was sufficiently pervasive, are questions a district court is not well-suited to

determine on a motion for summary judgment").

But it's equally true that courts properly decide this issue at the summary judgment stage

(and sometimes, even on a motion to dismiss), when a plaintiff's claim rests on evidence that—

even when treated as true—unquestionably falls short of the standard for severe and pervasive.

*See, e.g.*, *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 522–23 (10th Cir. 2017) (affirming

dismissal of hostile work environment claim based on three "inappropriate and offensive" racial

comments over the course of some six months because such verbal harassment, even when

combined with co-workers giving plaintiff "the cold shoulder" after he complained, wasn't so

---

[11]     Plaintiff cites *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) to
support her assertion that "the severity and pervasiveness evaluation is particularly unsuited for summary
judgment." *O'Shea* was a sexual harassment case alleging a hostile work environment. *Id.* at 1096.
There, in the context of sexual harassment claims, our Circuit noted that "the severity and pervasiveness
evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact."
*Id.* at 1098 (citations and internal quotation marks omitted). And, using a *cf.* signal, the Circuit cited an
Eighth Circuit case for a different but somewhat analogous proposition—*i.e.*, that "'summary judgment
should seldom be used in employment discrimination cases.'" *Id.* (quoting *Smith v. St. Louis Univ.*, 109
F.3d 1261, 1264 (8th Cir. 1997)). Since then, the Eighth Circuit, sitting en banc, has overruled *Smith* and
other cases "asserting a different standard of review for summary judgment in employment discrimination
cases" because such a standard is "contrary to Supreme Court precedent." *Torgerson v. City of
Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011). In *Torgerson*, the Eighth Circuit held: "There is no
'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to
determine whether any case, including one alleging discrimination, merits a trial." *Id.* Thus, the court
takes plaintiff's point—severity and pervasiveness can qualify as a factual question—but, recognizes that
this legal authority relies in some respects on law that is no longer good law.

"severe or pervasive that a reasonable person would find it altered the conditions of [plaintiff's] employment and created an abusive working environment"); *Bryant v. Neb. Furniture Mart*, No. 20-2216-DDC-JPO, 2021 WL 259294, at *8–9 (D. Kan. Jan. 26, 2021) (dismissing hostile work environment claim because "plaintiff allege[d] no overtly racial comment or remark that might constitute severe or pervasive harassment"); *Asebedo v. Kan. State Univ.*, No. 12-CV-1373-EFM, 2015 WL 4664932, at *4 (D. Kan. Aug. 5, 2015) (granting summary judgment against hostile work environment claim where plaintiff's "evidence of severe or pervasive behavior based upon his race" consisted of "isolated incidents spanning a one-year period" including "several race-based jokes," and "racial comments . . . made throughout the year," but included "no evidence of the frequency or specifics" about the time factor); *Carpenter v. Sw. Bell Tel. Co.*, 27 F. Supp. 3d 1168, 1172 (D. Kan. 2014) (granting summary judgment against hostile work environment claim where plaintiff argued "whistling was a disruption by non-black fellow employees . . . 'designed to aggravate, obstruct, and undermine'" him, but he couldn't show whistling was based on race, and instead could only "point to one arguably racial comment[,]" and otherwise relied on a "conclusory claim" that his coworkers "'subjected [him] to an unrelenting pattern of racial harassment'").

Defendants predictably argue that the court should decide this question—severity and pervasiveness—as a matter of law because, even when viewed in the light most favorable to plaintiff, there's still not enough for a reasonable juror to find that severe or pervasive harassment occurred.  Defendants argue that the allegedly inappropriate questions and actions of coworkers were isolated—*i.e.*, Mr. Fox asked plaintiff where she attended pharmacy school once; Mr. Fox brought beads to work and mentioned the slave trade once; Ms. Finger asked plaintiff if she ever washed her hair once; someone asked plaintiff about Nigerian cars and

currency once; Ms. Seddon asked plaintiff where she learned to speak English once; and, Ms. Seddon reacted in an offensive manner about Martin Luther King, Jr. Day once. Defendants argue that these one-time incidents—even when added together—don't amount to an objectively pervasive or severe environment.

Ultimately, the court agrees with defendants, and concludes that plaintiff fails to present a triable Title VII hostile work environment claim. More specifically, plaintiff fails to create a triable issue about the final prima facie element—that "due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *See Lounds*, 812 F.3d at 1222 (citation and internal quotation marks omitted). The few specific instances supported by plaintiff's evidence—her supervisor's offensive remark about Nigerian women, her coworker's comment about "slave trade beads," her coworker's question about her hair, and questions about Nigeria that a reasonable person could construe as offensive—don't rise to the level of severe or pervasive under Title VII hostile work environment precedent. These isolated episodes occurred across approximately a two year period—"in 2019 and 2020." Doc. 65-15 at 3. The handful of "isolated incidents of racial enmity or sporadic slurs," that occurred over about a two-year period, don't come close to a showing of "a steady barrage of opprobrious racial comments." *Chavez*, 397 F.3d at 832 (citation and internal quotation marks omitted).

Plaintiff doesn't adduce evidence of either a "sufficiently severe episode" *or* a "relentless pattern of lesser harassment that extends over a long period of time." *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 521 (10th Cir. 2017). Instead, plaintiff's allegations resemble cases where a plaintiff's claims failed—as a matter of law—to rise to a level of "severe or pervasive that a reasonable person would find it altered the conditions of [plaintiff's] employment and

created an abusive working environment." *Id.* at 522–23 (affirming summary judgment against Title VII claim).

For example, in *Brown*, plaintiff—the only African American dockhand at defendant's business—alleged a hostile work environment after his supervisor made three racist comments to him, and after he complained, his supervisors and coworkers gave him the "cold shoulder" or "silent treatment." *Brown*, 708 F. App'x at 522. In that case, plaintiff's supervisor said, "do you know why the inside of black people's hands are white, and the bottoms of their feet are white?" *Id.* at 521. And "then positioned himself toward a wall and placed his hands against the wall, as if he was getting arrested and frisked." *Id.* He also said, "Hey [plaintiff], [a coworker] brought a leash and a collar to work today, you need to let him put the collar around your neck and walk you around with a leash at the Juneteenth Festival, when he goes to get the food. You know, like they used to do to slaves back in the day. I even got him a white hood to put on his head." *Id.* Finally, when the supervisor overheard plaintiff discussing his wife's desire to have another child, he told plaintiff, "Cool, you can just go get on welfare." *Id.*

Accepting these factual allegations as true, the district court in *Brown* concluded that this alleged racial harassment didn't rise to the level necessary to state a claim for a hostile work environment. So, it granted a motion to dismiss. The Circuit affirmed. The Circuit explained that "isolated incidents . . . are sufficient to support a hostile work environment claim only when they are 'threatening and severe' or 'especially egregious or extreme.'" *Id.* (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 666–67 (10th Cir. 2012)). *Brown* offers an example of isolated comments—objectively far more racially offensive than relied on by plaintiff here—failing to establish a pervasive and hostile work environment.

Plaintiff falls short on both the severity and pervasiveness showings.  The facts—viewed in the light most favorable to her—amount, at most, to a handful of isolated offensive comments related to her race.  The Tenth Circuit's discussion in *Sotunde* also illustrates this principle.  In *Sotunde*, the Circuit affirmed a grant of summary judgment against plaintiff's racially hostile work environment claim because plaintiff "had failed to show that he was subjected to discriminatory harassment that was severe or pervasive."  *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 765–66 (10th Cir. 2017) (affirming summary judgment because plaintiff failed to show severe or pervasive harassment through the following incidents—a conversation with his supervisor where his supervisor said plaintiff "could not call [his supervisor] a racist because he [had] hired [plaintiff;]" plaintiff's supervisor and coworkers excluded him from certain conversations and e-mail communications at work; once when plaintiff called in sick, his supervisor demanded he report to work even though he was taking a prescription painkiller, and when plaintiff's wife (a pharmacist) told him he couldn't operate heavy machinery while on the painkiller, then his supervisor told other employees that plaintiff's wife had a big mouth; and a conversation among employees that plaintiff "would not be employed by [defendant] much longer").

The Circuit found that these incidents were "insufficient for a reasonable jury to find [plaintiff] was subjected to an objectively racially hostile work environment" because they didn't "rise to the level of conduct that [the Circuit has] held creates a genuine issue of material fact as to severity or pervasiveness."  *Id.* at 766 (citing *Tademy*, 614 F.3d at 1144–45 ("involving a series of harassing acts, including 'various graffiti and cartoons combined with the words "nigger" and "nigger go home" etched on [the plaintiff's] locker,' that culminated in a lynching noose")).

"Tellingly, in at least two cases involving more egregious facts than those alleged by [plaintiff in *Sotunde*, the Circuit] held that the evidence of pervasiveness created a 'close' question." *Id.* at 766–67 (first citing *Lounds*, 812 F.3d at 1213–17, 1227 ("involving multiple and continual references to racial stereotypes, a discussion of lynching, *habitual use* of the term 'nigga' and references to 'the hood,' and direction to address a vice president with 'yes massa'" (emphasis added)); then citing *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680-82, 683 (10th Cir. 2007) ("involving several discrete incidents of racial harassment *over four years* and ongoing harassment—including comments referring to plaintiff's ethnicity *every two to three days*—in addition to comparatively poorer treatment of plaintiff and his son, the only Hispanic employees" (emphasis added))).

As was the case in *Sotunde*, plaintiff here—when compared to the Circuit's "close question" cases above—doesn't identify sufficient facts to "create even that close a question." *Id.* Instead, plaintiff's facts are more "analogous to those in [Circuit] decisions concluding that the alleged actions failed to support a claim for a hostile work environment." *Id.* at 767 (first citing *Morris*, 666 F.3d at 665–66 ("holding evidence of isolated physical contact, throwing human tissue, and yelling and making demeaning comments about plaintiff's work was insufficient"); then citing *McGowan v. City of Eufala*, 472 F.3d 736, 743–44 (10th Cir. 2006) ("noting that many of plaintiff's allegations, such as an officer's 'petty criticism of her work' were 'of a trivial nature and do not rise to a claim of an "abusive" materially adverse work environment'"); then citing *Chavez*, 397 F.3d at 832 ("holding that two racially offensive remarks '[fell] far short of the "steady barrage" required for a [racially] hostile environment claim'")).

Finally, plaintiff hasn't adduced any evidence that anyone at LSH's pharmacy engaged in conduct so "'extreme to amount to a change in the terms and conditions of [her] employment[.]'" *Brown*, 708 F. App'x at 522 (quoting *Faragher*, 524 U.S. 775 at 788).  And her remaining episodes are simply too vague and conclusory.  Plaintiff's "broad, general allegations" can't carry the day.  *Asebedo v. Kan. State Univ.*, No. 12-CV-1373-EFM, 2015 WL 4664932, at *4 (D. Kan. Aug. 5, 2015) ("Vague and conclusory statements regarding the use of racial slurs with no content or context does not support an inference of pervasive racial/ethnic harassment.").[12]

## B.  Title VII disparate treatment unlawful discharge claim

Next, plaintiff alleges disparate treatment based on race and national origin against defendants Kansas and KDADS.  Doc. 63 at 16–17 (Pretrial Order ¶ 4.a.ii.).  The court evaluates this case's Title VII disparate treatment claim using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).  Under this framework, first, plaintiff must establish a prima facie case of disparate treatment.  *See Khalik*, 671 F.3d at 1192.  Second, if plaintiff meets her prima facie burden, then the burden shifts to defendants to provide a legitimate, non-retaliatory reason for its employment action.  *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003).

---

[12]         The court recognizes its analysis must analyze the "overall scenario" not just "individual incidents," *Lounds*, 812 F.3d 1224 (citation and internal quotation marks omitted), and plaintiff doesn't need to recall the specifics of each allegation, *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 F. App'x 914, 921 (10th Cir. 2009) ("A hostile work environment claimant need not establish precise dates for every insult.  After all, the point of such claims is that the discrimination was ongoing and pervasive, that is, *all the time*, and not at isolated points in time."), but vague and conclusory claims of ongoing discrimination can't carry the day on summary judgment, *see id.*; *see also Faragalla v. Douglas Cnty. Sch. Dist. RE 1*, 411 F. App'x 140, 152 (10th Cir. 2011) (affirming district court holding that "conclusory allegations of harassment . . .were insufficient to establish a hostile work environment"); *Pfannenstiel v. Kansas*, No. 5:21-cv-04006-HLT-ADM, 2022 WL 873674, at *15 (D. Kan. Mar. 24, 2022) ("Simply stating that the conduct occurred 'often,' . . . is insufficient to show that it was pervasive without more context[.]" (citation and internal quotation marks omitted)).

Last, if the employer satisfies that burden, the burden then shifts back to plaintiff to show that defendants' proffered reason for the employment action was pretextual. *Id.*

Defendants argue that the court should grant summary judgment against this claim because plaintiff can't establish a prima facie case. They also argue, in the alternative, that they can present legitimate, non-discriminatory reasons for terminating plaintiff, and plaintiff hasn't adduced evidence of a triable issue of pretext. Plaintiff disagrees. She argues that she has presented evidence sufficient to show a prima facie case and pretext. The court assumes, without deciding, that plaintiff could establish her prima facie case of discrimination; and the court concludes that defendants have established a legitimate, non-discriminatory reason for terminating plaintiff's employment. This claim's disposition thus turns on whether plaintiff has come forward with sufficient evidence to show a triable issue of pretext.

### 1. Have defendants provided a legitimate, non-discriminatory reason for terminating plaintiff's employment?

At the second stage, the burden shifts to defendants. *See Jones*, 349 F.3d at 1266. This stage's burden requires defendants to articulate a legitimate, non-discriminatory reason for terminating plaintiff's employment. *Id.* Our Circuit has explained that the defendant employer, at this second step, doesn't "'need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)). "'[T]his stage of the analysis only requires the defendant to articulate a reason for the [employment decision] that is not, on its face, prohibited' and that is 'reasonably specific and clear.'" *Id.* (first alteration in original) (quoting *Flasher*, 986 F.2d at 1316 & n.4).

The court concludes that defendants have articulated reasonably specific and clear reasons for their employment decision. LSH pharmacy employees reported plaintiff's behavior to HR in March 2020. After this report, HR worked with plaintiff's supervisor, Ms. Seddon, and the pharmacy implemented objective performance standards. On June 10, 2020, pharmacy employees again reported to HR about plaintiff's workplace conduct. Defendants launched an investigation into this second complaint about plaintiff. Defendants' HR employee interviewed plaintiff's coworkers, and each one reported behavior by plaintiff that violated LSH's policies and was otherwise unacceptable in a workplace—*i.e.*, not performing certain tasks, showing up to work late, falsifying timesheets, sleeping at work, and working on schoolwork at work. The other pharmacists and pharmacy technicians also reported that plaintiff created a toxic work atmosphere for her coworkers. The investigation concluded that plaintiff violated three provisions of the KDADS State Hospital Employee Policy Manual. None of these reasons are facially proscribed—so, they satisfy defendants' burden at this step. Also, plaintiff doesn't contest that the reasons in the termination letter are facially legitimate, nondiscriminatory reasons and defendants thus meet their burden at this step. *See* Doc. 70 at 52. So, the court's analysis now turns to the third step of the *McDonnell Douglas* framework: pretext.

**2. Has plaintiff adduced evidence that presents a triable issue of pretext?**

At the third step of *McDonnell Douglas*, a plaintiff can establish a triable issue whether the articulated legitimate reason is really a pretext concealing discriminatory animus by revealing "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the

asserted non-discriminatory reason.'" *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217

(10th Cir. 2002) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

When analyzing the pretext question, the court doesn't "ask whether the employer's

reasons were wise, fair or correct[.]" *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th

Cir. 2007).  Instead, the court asks "whether the employer honestly believed its reasons and acted

in good faith upon them." *Id.* at 1119.  So, the court considers "the facts as they appeared to the

person making the decision," and the court can't "second-guess the employer's decision even if

it seems in hindsight that the action taken constituted poor business judgment." *Id.*  "'The reason

for this rule is plain:  [the court's] role is to prevent intentional discriminatory . . . practices, not

to act as a "super personnel department," second guessing employers' honestly held (even if

erroneous) business judgments.'" *Id.* (quoting *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th

Cir. 2006)).

Plaintiff here argues that the reasons offered in her termination letter were pretextual for

three reasons:  (1) defendants failed to follow their policy of implementing progressive

discipline; (2) defendants conducted an unfair investigation and stated false reasons for

plaintiff's termination; and (3) defendants treated similarly situated employees differently than

plaintiff.  The court addresses each one of plaintiff's pretext arguments in turn, below.

### a.   Failure to follow "progressive discipline" policy

Plaintiff first challenges defendants' proffered reasons because, she argues, defendants

failed to follow their own discipline policy.  "A defendant's failure to follow its own written

policy can be evidence of pretext." *Metzger v. City of Leawood*, 144 F. Supp. 2d 1225, 1262 (D.

Kan. 2001) (citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1168 (10th Cir. 1998) (plaintiff

can show defendant's reason for termination during reduction in force is pretextual if defendant

failed to follow own policy) (further citation omitted)).  Here, plaintiff argues that defendants'

failure to follow its "progressive discipline policy"—KDADS Employee Policy 3.6—suggests

pretext.

Policy 3.6 defines "progressive discipline" as "discipline administered in stages, starting

from the least severe progressing to the most severe."  Doc. 70-19.  It requires "KDADS

supervisors [to] use progressive discipline consistently and reasonably to address work

performance deficiencies or detrimental personal conduct."  *Id.*  Plaintiff argues that defendants'

decision to terminate her without first imposing any form of lesser punishment—even though

defendants had never disciplined or counseled plaintiff about conduct or work performance—

violated Policy 3.6.

Defendants respond, arguing that plaintiff didn't include passages from the policy that

recognize defendants have discretion to utilize any degree of discipline and thus defendants

didn't violate the policy.  Defendants highlight the following:  Policy 3.6 provides that

"[p]rogressive discipline may be administered for violating any KDADS" policy; "[p]rogressive

discipline includes . . . suspension, demotion, and/or dismissal[;]" and, "[d]epending on the

nature/severity of an incident progressive discipline stages may be skipped or repeated as

deemed appropriate[.]"  Doc. 70-19.  Also, defendants argue, each of the three policies plaintiff

violated—3.8, 3.8 K, and 4.8—explicitly provides that violations could lead to an employee's

termination.  Defendants argue these parts of the KDADS policy gave them complete authority

and discretion to terminate plaintiff's employment without first implementing lesser disciplinary

measures.

The court agrees with defendants.  Ms. Prescott found that plaintiff had violated Policy

3.8.  Upon a violation of that policy, it allows for "disciplinary action, including dismissal" based

on "the nature and severity of the employee's conduct" and "other relevant factors."  Doc. 65-8 at 2.  Also, defendants' discipline policy, Policy 3.6, confers discretion to skip steps based on the severity of the conduct, permitting terminating an employee.  And "where progressive discipline is entirely discretionary, and the employer did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline is not evidence of pretext."  *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1291 (10th Cir. 2013) (quotation cleaned up) (affirming summary judgment for employer because of insufficient pretext evidence); *see also Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) ("[E]ven if [the employer] fell short of [plaintiff's] expectation of progressive discipline, this fact adds little to the pretext analysis" because the "'mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that . . . the substantive reasons given by the employer for its employment decision were pretextual.'" (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995))).

In the current case, no reasonable jury could find that defendants' decision not to implement lesser discipline violated its policy—a policy permitting discretion.  Thus, it can't qualify as evidence supporting a finding of pretext.

### b.  Veracity of investigation results & legitimacy of investigation

Plaintiff next alleges that the result of defendants' investigation—defendants' stated reasons for plaintiff's termination—are false.  Where the plaintiff has presented a genuine factual issue "whether [defendants'] stated reason for her termination was false, summary judgment" is inappropriate.  *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1126–27 (10th Cir. 2005) (reversing summary judgment where plaintiff's evidence cast doubt on her failure to meet internal audit standards, the dominant proffered reason for her termination).  Plaintiff argues that she has

adduced evidence suggesting the allegations made about her workplace conduct were false, and that Ms. Prescott substantiated these allegations without conducting a fair investigation.

Plaintiff argues that "there is . . . no objective evidence that [she] violated any policy." Doc. 70 at 57. She argues that she can demonstrate that some of the allegations against her—substantiated by Ms. Prescott's investigation—are false. *First*, plaintiff's coworkers alleged plaintiff made long personal calls at work. And the call logs, plaintiff claims, support her position that she didn't use her phone excessively. *Second*, plaintiff argues that Ms. Prescott "blindly accepted" the allegations about her excessive internet use. *Id.* at 55. The internet use report didn't show whether a visited IP address was work related or personal, and so, plaintiff argues, Ms. Prescott's conclusion that she had violated defendants' policies about personal use of internet was unfounded. *Third*, plaintiff argues that the allegations she slept at work were too inconsistent—one coworker said 30 times, a few coworkers said a couple times, some didn't mention it at all—to qualify as believable.

Plaintiff's arguments fall short of the pretext standard. She fails to demonstrate any evidence that Ms. Prescott didn't honestly believe the conclusion of her investigation. When analyzing the pretext question, the court doesn't "ask whether the employer's reasons were wise, fair or *correct*[.]" *Riggs*, 497 F.3d at 1118 (emphasis added). Instead, the court asks "whether the employer honestly believed its reasons and acted in good faith upon them." *Id.* at 1119. Ms. Prescott testified that even though the phone audit was incomplete, she still found many non-work-related phone calls lasting more than 20 minutes. She testified that many of plaintiff's coworkers complained about her excessive internet use, and she found that plaintiff often browsed non-work-related websites. And Ms. Prescott testified that plaintiff's coworkers gave statements substantiating that she slept at work, and "gave similar dates of approximation as far

as the time of occurrence that these [sleeping] incidents happened." Doc. 70-12 at 55 (Prescott Dep. 55:9–15).

In sum, the record shows that Ms. Prescott made findings in good faith based on the information available to her. When the court considers "the facts as they appeared to the person making the decision,"—Ms. Prescott—it can't "second-guess [her] decision even if it seems in hindsight that the action taken constituted poor business judgment." *Riggs*, 497 F.3d at 1119. Plaintiff may disagree with her conclusions, but she hasn't adduced any evidence that her conclusions were pretext. *See Bacy v. Chickasaw Nation Indus., Inc.*, 854 F. App'x 944, 947 (10th Cir. 2021) (holding plaintiff's "pretext argument fails because she has not presented any evidence showing [employer] did not honestly believe she was insubordinate . . . Although [plaintiff] disagrees with [the investigation's] conclusions, she has not presented any evidence showing either [investigator or decision maker] did not honestly believe she behaved in an unprofessional and insubordinate manner").

Plaintiff also contends that Ms. Prescott "blindly accepted" others' versions of the events of June 10, 2020 and wrongfully disregarded her version of the events. Plaintiff argues that Ms. Prescott could've reviewed videos of the incident, and her decision not to do so—and her acceptance of others' retelling of the incident—demonstrates pretext. Again, the shortcomings of Ms. Prescott's investigation don't amount to evidence of pretext. An argument that Ms. Prescott could've more thoroughly combed through phone records or watched security footage doesn't show that Ms. Prescott didn't "honestly believe [plaintiff] behaved in an unprofessional and insubordinate manner" or that she violated defendants' policies. *See id.*

Plaintiff also argues that, here, the "decisionmaker's uncritical 'reliance' on facts provided by a biased supervisor" led to her termination. *Lobato v. N.M. Env't Dep't*, 733 F.3d

1283, 1294 (10th Cir. 2013) (quotation cleaned up).  If the evidence indeed supported her assertion, plaintiff would have created a triable issue of pretext.  But it doesn't.  In *Lobato*, the Circuit explained that "[i]f there is no such reliance—that is to say, if the employer independently verifies the facts and does not rely on the biased source—then there is no subordinate bias liability."  *Id.*  The record shows that Ms. Prescott conducted an independent investigation of the claims made against plaintiff; and she gathered facts from many sources. She "investigated the matter herself and even . . .  solicit[ed]" plaintiff's point of view.  *Id.* at 1296.  *See also Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) ("Employer may 'defeat the inference that an employment decision was' a product of reliance on a biased subordinate by 'simply asking an employee for his version of events,' and not 'rely[ing] exclusively on the say-so of the biased subordinate[.]'" (quoting *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 488 (10th Cir. 2006))).  Because defendants asked plaintiff for her version of the events, and relied on interviews with multiple employees, not just "the say-so of a biased subordinate" before making the employment decision—plaintiff can't establish liability with this argument.  Thus, the court concludes that plaintiff hasn't established a triable issue of pretext with this second argument.

### c.  Similarly situated employees

Finally, plaintiff contends that she can demonstrate pretext because defendants treated similarly situated employees differently than they treated her.  Again, plaintiff's theory isn't errant for a plaintiff can demonstrate a triable question of pretext by providing evidence that she "was treated differently from similarly-situated employees."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011).

And yet again, the problem is that plaintiff fails to provide the facts her theory requires. To make such a showing, plaintiff must adduce evidence that another employee's "situation is similar to hers or they . . . engaged in the same conduct as she." *Luke v. Hosp. Shared Servs., Inc.*, 513 F. App'x 763, 765 (10th Cir. 2013). Plaintiff supplies three instances as evidence showing, she claims, that defendants treated similarly situated employees more favorably than her: (1) defendants didn't place Mr. Fox on administrative leave after the June 10, 2020 incident; (2) defendants terminated plaintiff "for allegedly relative minor conduct violations" but didn't punish Mr. Fox for making medication errors; and (3) defendants only wrote-up Ms. Seddon for documented insubordination. These examples, plaintiff argues, demonstrate other instances of similar or worse conduct, and defendants didn't punish the similarly situated employee as harshly as they punished plaintiff. Defendants argue that the comparator in each example fails because none of these employees were true comparators—that is, they weren't "similarly situated" to plaintiff. The court agrees with defendants.

*First*, on June 10, 2020, two pharmacy technicians reported plaintiff to HR. They didn't report Mr. Fox. For the second time in the span of a few months, plaintiff's coworkers reported that plaintiff had created a toxic work environment. No employee issued a similar report about Mr. Fox (until plaintiff recounted her version of the June 10 incident, after coworkers reported her behavior). Plaintiff hasn't adduced evidence that the two pharmacists engaged in the same or similar conduct. *See Luke*, 513 F. App'x at 765 (affirming summary judgment where plaintiff's "claims [that] several white, male [defendant] employees worked on the tamale fundraiser and were not disciplined" failed to demonstrate discrimination "because no evidence demonstrate[d] the white males' situation [was] similar to [plaintiff's situation] or [that] they" had engaged in the same conduct as plaintiff had).

Next—addressing plaintiff's *second* and *third* examples—plaintiff compares incidents of Mr. Fox making a medication error in 2017 and Ms. Seddon's instance of insubordination, and the lack of punishment they each received, to her conduct and subsequent termination.  These two examples fail for the same reasons.  In both cases, Lola Olagunju acted as the supervisor in charge of disciplinary actions issued to Mr. Fox and Ms. Seddon.  Involvement of a different supervisor means employees aren't similarly situated.  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline.").  And in both cases, the other employees' misconduct isn't sufficiently similar to plaintiff's alleged misconduct here.  The Circuit has explained that "even employees who are similarly situated must have been disciplined for conduct of 'comparable seriousness' in order for their disparate treatment to be relevant." *McGowan*, 472 F.3d at 745 (quoting *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).  Plaintiff hasn't adduced evidence that Ms. Seddon or Mr. Fox's conduct was comparable to hers, and even if she had, the undisputed fact remains that a different supervisor oversaw the pharmacy when her coworker engaged in this misconduct.

In sum, none of plaintiff's three pretext arguments get her past summary judgment.  Ms. Prescott conducted the investigation into plaintiff's behavior.  No evidence can support a finding that Ms. Prescott didn't honestly believe the reports of plaintiff's coworkers, and thus, she acted in good faith on her beliefs.  Further, no evidence can support a finding that Ms. Dipman didn't honestly believe Ms. Prescott's report, and thus, she acted in good faith when she relied on this report and decided to terminate plaintiff.  And as discussed above, the court analyzes the pretext question, by considering "the facts as they appeared to the person making the decision[.]" *Riggs*,

497 F.3d at 1119.  The court doesn't "ask whether the employer's reasons were wise, fair or correct," instead it asks "whether the employer honestly believed its reasons and acted in good faith upon them."  *Id.* at 1118–19.  The summary judgment record shows that Ms. Prescott or Ms. Dipman acted in good faith when they investigated then terminated plaintiff's employment. Plaintiff has adduced no evidence showing otherwise.

Also, plaintiff hasn't asserted facts showing a discriminatory motive factored into defendants' decision to terminate her employment, let alone served as a primary influence.  *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017).  The "pretext inquiry is a motive inquiry," *Sydney v. ConMed Elec. Surgery*, 275 F. App'x 748, 753 (10th Cir. 2008), and plaintiff hasn't adduced sufficient evidence to create a triable question whether defendants' motive either was driven primarily by a discriminatory factor or that defendants' proffered reason "'is unworthy of credence[,]'" *Taylor v. Cramer, Inc.*, No. 01-2228-GTV, 2002 WL 1461972, at *4 (D. Kan. July 3, 2002) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  Viewed in the light most favorable to plaintiff, a reasonable jury couldn't find defendants' articulated reasons for firing plaintiff—her violations of multiple policies—are "factually false." *DePaula*, 859 F.3d at 970.  Likewise, a reasonable jury couldn't conclude that discrimination was a primary factor in that decision.  *Id.*

Because plaintiff has failed to shoulder her "'full burden of persuasion,'" *Swackhammer v. Sprint United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (quoting *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005)), to demonstrate a triable question that defendants' proffered reason is pretextual, the court grants defendants' summary judgment motion against plaintiff's Title VII disparate treatment claim.

## C. Title VII retaliation claim

Plaintiff's third and final Title VII claim alleges defendants Kansas and KDADS retaliated against her because of her complaints about race and national origin discrimination and harassment.  Doc. 63 at 17–18 (Pretrial Order ¶ 4.a.iii.).  Defendants argue they are entitled to summary judgment on this claim because plaintiff has failed to present a triable prima facie claim of retaliation under Title VII.  Plaintiff argues summary judgment isn't appropriate on this claim because defendants placed her on administrative leave and then terminated her after (a) she complained about disparate treatment to her supervisor, (b) she posted Governor Kelly's letter condemning racism in her office space, and (c) her attorney sent a letter to defendants about the discrimination she had faced.  The court addresses arguments about each instance of alleged protected activity under Title VII, below.

"'[R]etaliation against an employee because she has "opposed" any practice made unlawful by Title VII,' such as creating or condoning a hostile work environment, is forbidden." *Lounds*, 812 F.3d at 1233 (quoting *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (quoting 42 U.S.C. § 2000e-3(a))).  A plaintiff bringing a Title VII retaliation claim, "must establish that retaliation played a part in the employment decision" and may "satisfy this burden in two ways."  *Id.* (citations and internal quotation marks omitted).  Plaintiff "may either (1) offer direct evidence that retaliation 'played a motivating part' in an employment decision adverse to her interests, or (2) rely upon circumstantial evidence under 'the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation.'"  *Id.* (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008)).

Here, plaintiff doesn't offer direct evidence of retaliation, so the court evaluates her retaliation claim under the *McDonnell Douglas* burden-shifting framework.  *See Khalik*, 671 F.3d at 1192; *see also Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (noting that "[w]here, as here, the plaintiff does not have direct evidence of retaliation, we follow the three-step framework from *McDonnell Douglas*").  Under this burden-shifting framework, first, plaintiff must establish a prima facie case of retaliation.  *See Khalik*, 671 F.3d at 1192–93.  Second, if plaintiff meets her prima facie burden, the burden then shifts to defendants to provide a legitimate, non-retaliatory reason for its employment action.  *Id.*  Last, if defendants satisfy that burden, the burden then shifts back to plaintiff to show that defendants' proffered reason for the employment action was pretextual.  *Id.*

### 1.  Has plaintiff presented a triable prima facie case?

To establish a prima facie case of retaliation under Title VII, "a plaintiff must demonstrate (1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006)).

Plaintiff alleges she engaged three times in protected opposition to discrimination:  *One*, when she complained to her supervisor about Ms. Seddon "that she was being discriminated against."  Doc. 70 at 61.  *Two*, when plaintiff posted "the Governor's letter regarding racial inequity" in her office.  *Id.*  And *three*, when plaintiff's counsel sent a letter to defendants' human resources department.

Defendants argue that plaintiff didn't engage in activity protected by Title VII when she complained to Ms. Seddon or when she posted Governor Kelly's letter condemning racism.  And so, defendants argue, plaintiff can't predicate a viable Title VII retaliation claim on either act. The court agrees with defendants and explains why below.

For the first two instances of purportedly protected opposition—the complaints to Ms. Seddon and the Governor's letter—the court's analysis begins and ends with the first requirement of a prima facie case, *i.e.*, did plaintiff "engage[] in protected opposition to discrimination" when she took these two actions?  *Argo*, 452 F.3d at 1202.  She didn't.  The third instance of protected opposition—plaintiff's attorney's letter—fails on the third prima facie prong, causation.

Title VII makes it unlawful for an "employer to discriminate against any of [its] employees" because the employee has "opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  "Protected activity for the purposes of Title VII retaliation includes either (1) participating in or initiating a Title VII proceeding or (2) opposing discrimination made unlawful by Title VII."  *Boese v. Fort Hays State Univ.*, 814 F. Supp. 2d 1138, 1146 (D. Kan. 2011), *aff'd*, 462 F. App'x 797 (10th Cir. 2012).  "To show she engaged in protected activity, [plaintiff] doesn't need to show that she reported an actual Title VII violation; rather, she must only show 'a reasonable good-faith belief that' she was opposing discrimination."  *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018) (quoting *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004)).

Specifically, plaintiff claims that defendants retaliated against her by terminating her employment after she complained to her supervisor and posted a letter in the pharmacy condemning racism.  The court first explains why plaintiff's informal complaints to her supervisor don't qualify as protected activity; then, it explains why plaintiff's decision to display a letter condemning racism doesn't qualify as protected activity.  Finally, it addresses why plaintiff's attorney's letter couldn't have caused her termination.

> **a.  Informal complaints to Ms. Seddon don't qualify as protected opposition for a Title VII retaliation claim.**

As a matter of law, plaintiff's initial foothold—her reports to Ms. Seddon—can't qualify as protected activity for opposing discrimination made unlawful by Title VII.  Plaintiff didn't engage in activity protected by Title VII when she complained to Ms. Seddon about her coworkers' behavior.  While "voicing informal complaints to superiors," can qualify as protected opposition, *Hertz*, 370 F.3d at 1015, such complaints "must convey to the employer [plaintiff's] concern that the employer has engaged in [an unlawful employment] practice[,]" *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  Plaintiff's informal complaints about her coworkers don't qualify as "an unlawful employment practice" consisting of discrimination based on an individual's "race, color, religion, sex, or national origin."  *See* 42 U.S.C. § 2000e-2(a)(1).

As our Circuit has explained, albeit in an unpublished case, making "a vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim." *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004).  The Tenth Circuit reinforced *Anderson*'s holding in a published case—*Hinds v. Sprint/United Management Co.*, 523 F.3d 1187 (10th Cir. 2008).  In it, plaintiff claimed that his

employer had engaged in "ADEA retaliation" because plaintiff had complained about age discrimination in his workplace.  *Id.* at 1201.  The trial court rejected plaintiff's ADEA retaliation claim, and the Circuit affirmed.  It reasoned that plaintiff's email complaints failed to qualify as protected opposition because they didn't "mention or even allude to age or age discrimination."  *Id.* at 1203.  Judge Gorsuch's opinion explained that "no magic words are required," but "to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the ADEA. General complaints about company management . . . will not suffice."  *Id.* (footnote omitted); *see also Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("[A]n employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII.").

Plaintiff fails to present a triable issue on protected activity here because "it is not remotely clear from the evidence that plaintiff, in the course of reporting [feeling excluded by her coworkers], conveyed to defendant[s] a concern 'that the employer has engaged in a practice made unlawful' by Title VII."  *Fassbender v. Correct Care Sols., LLC*, No. 15-CV-9373-JWL, 2017 WL 529602, at *10 (D. Kan. Feb. 9, 2017) (quoting *Hinds*, 523 F.3d at 1203), *aff'd in part, rev'd in part and remanded*, 890 F.3d 875, 891 (10th Cir. 2018) (affirming district court's holding that employee didn't engage in protected activity supporting Title VII retaliation claim). Plaintiff didn't convey to her employer—KDADS—or her supervisor, Ms. Seddon, a concern that *her employer* had engaged in a practice made unlawful by Title VII.  She reported informally to Ms. Seddon that the other pharmacists at LSH had excluded her or made comments that offended her.  *See Hinds*, 523 F.3d at 1203 ("Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern

that the employer has engaged in a practice made unlawful" by Title VII.); *see also Tracy v. Vail Resorts, Inc.*, No. 21-4145, 2022 WL 16557393, at *4 (10th Cir. Nov. 1, 2022) (affirming dismissal of Title VII claim where district court held plaintiff's reports to management of hazardous working conditions were not protected activity under Title VII); *Cardwell v. Davis Polk & Wardwell LLP*, No. 1:19-CV-10256-GHW, 2021 WL 4434935, at *30 (S.D.N.Y. Sept. 23, 2021) (holding that an "ambiguous complaint . . . does not qualify as protected activity because it was not sufficiently pointed to put any [d]efendant on notice that [plaintiff] was complaining about discrimination under federal, state, or city law"). In short, no reasonable jury could find that plaintiff had complained about discrimination under federal or state law, so her complaints about exclusion didn't amount to protected activity.

Summary judgment is also appropriate here because "plaintiff cannot show that she had a reasonable, good faith belief that she was opposing discrimination prohibited by Title VII." *Fassbender*, 2017 WL 529602, at *10 (citing *Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003)). Title VII demands more than plaintiff has adduced. To establish a triable issue on protected opposition under Title VII, plaintiff must establish she had a reasonable belief she had opposed an "unlawful employment practice" enumerated in Title VII.

"Title VII is a 'precise, complex, and exhaustive' statute, and it defines the term 'unlawful employment practice' with characteristic exactitude." *Cooper v. N.Y. State Dep't of Lab.*, 819 F.3d 678, 680–81 (2d Cir. 2016) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 355 (2013)).

> [Title VII] enumerates specific unlawful employment practices. *See* § 2000e-2(a)(1), (b), (c)(1), (d) (status-based discrimination by employers, employment agencies, labor organizations, and training programs, respectively); § 2000e-2(*l*) (status-based discrimination in employment-related testing); § 2000e-3(a) (retaliation for opposing, or making or supporting a complaint about, unlawful

employment actions); § 2000e-3(b) (advertising a preference for applicants of a
particular race, color, religion, sex, or national origin).

*Nassar*, 570 U.S. at 356. "Thus, a [Title VII] plaintiff alleging unlawful retaliation may not

recover unless [she] reasonably believed that the conduct [she] opposed ran afoul of one of these

particular statutory proscriptions." *Cooper*, 819 F.3d at 680–81 (citing *Manoharan v. Columbia

Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) (objecting to an

employer's failure to adhere to its own affirmative-action program is not protected activity,

because such a failure is not an "unlawful employment practice" under Title VII)).

Applying this legal principle to the summary judgment facts here, the court concludes

that no reasonable jury could find that plaintiff reasonably believed the conduct she had

reported—*i.e.*, her coworkers' inappropriate comments or behavior excluding her—was an

unlawful *employment* practice under Title VII.  So, plaintiff can't carry her burden to show that

she engaged in protected opposition to discrimination under Title VII.  The court thus grants

summary judgment against plaintiff's Title VII retaliation claim.

### b.  Plaintiff's display of the Governor's letter condemning racism doesn't qualify as protected opposition to support a Title VII retaliation claim.

As a preliminary matter, defendants argue that plaintiff waived this theory of protected

opposition by failing to include it in the Pretrial Order.  Plaintiff's Title VII relation claim lists

two allegations of protected opposition:  "[plaintiff] engaged in protected activities under Title

VII by reporting the discrimination and harassment to her supervisor. . . . [plaintiff] also engaged

in protected activity under Title VII when her attorney sent a letter on her behalf which raised

issues of systemic racism . . . ."  Doc. 63 at 17–18 (Pretrial Order ¶ 4.a.iii.).  The claim doesn't

include any assertion that plaintiff engaged in protected opposition by posting the Governor's

letter. *Id.* In fact, plaintiff doesn't even include that assertion anywhere in her factual

contentions in the Pretrial Order. *See id.* at 4–10 (Pretrial Order ¶ 3.a.).

The Pretrial Order controls the course of litigation. Fed. R. Civ. P.(d). "As such, claims,

issues, defenses, or theories of damages not included in the pretrial order are waived[.]" *Wilson*

*v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002). "'A plaintiff cannot escape the binding effect

of the pretrial order by raising new issues in a response to the defendant's motion for summary

judgment.'" *Sunderman v. Westar Energy, Inc.*, 520 F. Supp. 2d 1269, 1278 (D. Kan. 2007),

*aff'd*, 307 F. App'x 224 (10th Cir. 2009) (quoting *Robleado v. Deffenbaugh Indus.*, 136 F. Supp.

2d 1179, 1189 (D. Kan. 2001)). Thus, the court agrees with defendants. Plaintiff waived this

theory of recovery.

But even if plaintiff hadn't waived this theory of protected opposition, it would fail—for

many of the same reasons plaintiff's informal complaints to Ms. Seddon don't qualify as

protected opposition. Plaintiff cites a single Second Circuit case from 1990 to support her

assertion that Title VII's "opposition clause protects . . . protesting against discrimination by

industry or by society in general[.]" Doc. 70 at 61 (quoting *Sumner v. U.S. Postal Serv.*, 899

F.2d 203, 209 (2d Cir. 1990)). As discussed in detail above, recent case law from our Circuit

holds exactly the opposite. Plaintiff's posting of this letter amounted to a vague reference to

discrimination, but never opposed—explicitly—discrimination made unlawful by Title VII, and

thus doesn't support a Title VII retaliation claim. *See Anderson*, 122 F. App'x at 916. While the

letter may have conveyed a societal concern, it didn't convey to defendants a concern that they

had engaged in an employment "practice made unlawful by Title VII." *See Fassbender*, 2017

WL 529602, at *10. Title VII doesn't require "magic words." *Hinds*, 523 F.3d at 1203. But "to

qualify as protected opposition the employee must convey to the employer his or her concern

that *the employer* has engaged in a practice made unlawful" by Title VII.  *Id*. (emphasis added).

Plaintiff can't show that posting a letter—even one that condemns discrimination in general—

amounted to opposing an "unlawful employment practice" enumerated by Title VII.  *See Nassar*,

570 U.S. at 356.  No reasonable jury could find that plaintiff reasonably believed posting

Governor Kelly's letter amounted to opposing an unlawful employment practice under Title VII.

For these reasons, plaintiff can't carry her burden to show that she engaged in protected

opposition to discrimination under Title VII, when it comes to her informal complaints to her

supervisor or posting the Governor's letter in her workspace.

### c.   Plaintiff's attorney's letter fails to establish a prima facie case of Title VII retaliation on the causation prong.

The court assumes without deciding that plaintiff's attorney's letter—which references

race and national origin discrimination—qualifies as protected opposition.  The court assumes

that plaintiff, relying on the letter sent by her counsel, could fulfill the first two prongs for a

prima facie case of retaliation.  The letter recommended defendants re-evaluate their decision to

terminate plaintiff's employment and proceed without discrimination.  Plaintiff's termination

qualifies as the challenged action that a reasonable employee would have found materially

adverse.  So, plaintiff makes it to prong three.  But to establish the third element of her prima

facie case, plaintiff must show "a causal connection existed between the protected activity and

the materially adverse action."  *Argo*, 452 F.3d at 1202.   A "close temporal proximity between

the complaint and the termination . . . [is] sufficient to allow an inference that a causal

connection exist[s]" between the two.  *Id.*

As a preliminary matter, plaintiff has abandoned this theory of recovery—her counsel's

letter as protected opposition—for her retaliation claim.  Defendants' opening brief argues that

plaintiff can't establish causation.  Plaintiff's Opposition fails entirely to address defendants'

causation argument about her attorney's letter.  *See* Doc. 70 at 62–63 (plaintiff only makes

causation arguments about her reports to Ms. Seddon and posting the Governor's letter).  Thus,

plaintiff concedes this argument.  *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768

(10th Cir. 2001) (affirming district court's summary judgment against plaintiff's claim because

plaintiff had "abandoned [the] claim by failing to address it in his response to defendants' motion

for summary judgment"); *Loudon v. K.C. Rehab. Hosp., Inc.*, 339 F. Supp. 3d 1231, 1242 (D.

Kan. 2018) (holding that plaintiff had abandoned claim by not responding to defendant's

summary judgment arguments against the claim).

Even if plaintiff hadn't abandoned this argument, it would still fail the causation

requirement.  Defendants sent plaintiff a letter notifying her of her "proposed dismissal" on July

24, 2020.  The letter informed plaintiff that LSH planned to dismiss her for violating defendants'

policies.  On July 27, 2020, plaintiff responded to this proposed dismissal letter through her

counsel's letter denying that she had violated any of these policies.  Defendants then terminated

plaintiff's employment on August 3, 2020.  Defendants argue plaintiff can't show a causal

connection between her attorney's letter refuting the results of their investigation and plaintiff's

termination.  Defendants already had notified plaintiff that they intended to terminate her

employment before her attorney sent the letter.  Plaintiff hasn't adduced any evidence that

between the July 27 letter and the August 3 termination that defendants decided to terminate her

employment because of the letter, instead of because of the many reasons they listed in her

notice of proposed dismissal.  Thus, this third theory of protected opposition fails to present a

triable prima facie case.

### d. Summary

Plaintiff's first two allegations of protected opposition—the complaints to Ms. Seddon and the Governor's letter—don't amount to protected opposition to discrimination under Title VII.  Plaintiff also abandoned using the Governor's letter as a basis for this claim by failing to include it in the Pretrial Order.  Plaintiff's third allegation of protected opposition—her attorney's letter—fails because she never contested the causation argument and also it fails on the merits of the causation prong to create a triable prima facie case.  For these reasons, plaintiff fails to present a triable Title VII retaliation claim.  Thus, the court grants summary judgment on this claim.

## D.  Count IV:  Claims against defendant Seddon

Plaintiff has sued a third defendant, Mary Seddon, for race and national origin discrimination under 42 U.S.C. § 1981.  Doc. 63 at 18 (Pretrial Order ¶ 4.a.iv.).  Section 1981— which protects all persons' rights "to make and enforce contracts"—proscribes racial discrimination in the workplace.  42 U.S.C. § 1981; *see also Nassar*, 570 U.S. at 354–55.  Like Title VII, § 1981 "authorize[s] a plaintiff to bring a claim for hostile work environment based on unlawful race discrimination." *Lounds*, 812 F.3d at 1221; *see also Tademy*, 614 F.3d at 1154– 55.  And the court applies the "same substantive standards . . . to a hostile work environment claim regardless of whether the plaintiff has brought it under § 1981 or Title VII." *Lounds*, 812 F.3d at 1221.

Defendant Seddon has asserted a qualified immunity defense against this claim.[13]  Our Circuit explains that courts "have applied qualified immunity analysis to § 1981 claims . . . to

---

[13]      At the motion to dismiss stage, defendant Seddon raised this defense, and the court denied it.  But defendant is permitted to invoke the defense again, and the court revisits it here, through a different procedural lens. *See Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 868 n.6 (10th Cir.

shield from suit public officials who have been sued in their individual capacities for money damages, regardless of whether the underlying claim itself is assessed under *McDonnell Douglas*[.]" *Bird v. Regents of N.M. State Univ.*, 619 F. App'x 733, 743 (10th Cir. 2015) (citing *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1244 (10th Cir. 2000)).  When a defendant asserts qualified immunity, plaintiff must make a two-prong showing:  "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  That's because the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).  Here, plaintiff fails to present a triable issue whether defendant Seddon violated a statutory or constitutional right, and thus, defendant may avail herself of qualified immunity.

Plaintiff fails to present a triable issue whether defendant Seddon "violated a statutory or constitutional right[.]" *Ashcroft*, 563 U.S. at 735.  The facts, even when viewed in a light most favorable to plaintiff, establish that defendant Seddon made a couple of inappropriate comments to plaintiff, and didn't discipline plaintiff's coworkers for doing the same.  Altogether, no reasonable jury could find that defendant Seddon's conduct violated any clearly established law of which a reasonable person would have known.  *See Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) ("[Q]ualified immunity generally protects all public officials except those who are plainly incompetent or those who *knowingly violate the law*[.]" (citations and internal

---

2016) (noting that even if a court denies qualified immunity on a motion to dismiss, movant may invoke qualified immunity again on a motion for summary judgment).

quotation marks omitted) (emphasis added)).  Thus, the court finds that the doctrine of qualified immunity shields defendant Seddon from liability.  The court dismisses this claim.

## IV.     Conclusion

For the reasons explained above, the court grants summary judgment against plaintiff's Title VII claims against defendants Kansas and KDADS.  Also, it grants summary judgment against plaintiff's § 1981 claim based on qualified immunity.  These rulings conclude all the claims at issue in the case.  The court thus directs the Clerk of the Court to enter Judgment for defendants and close the case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 64) is granted in full, as explained in this Order.

**IT IS SO ORDERED.**

**Dated this 7th day of April, 2023, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree_____**
**Daniel D. Crabtree**
**United States District Judge**